871 P.2d 1352

**STATE of New Mexico, ex rel. Leonard A. HELMAN, et al., Petitioners–Respondents,**

v.

**Carlos GALLEGOS, Executive Secretary, New Mexico Public Employees Retirement Association; Public Employees Retirement Board, et al., Respondents–Petitioners.**

No. 20702.

Supreme Court of New Mexico.

March 7, 1994.

Rehearing Denied March 30, 1994.

Tom Udall, Atty. Gen., Michael Dickman, Asst. Atty. Gen., Santa Fe, for petitioners-respondents.

Roth, VanAmberg, Gross, Rogers & Ortiz, Ronald VanAmberg, Santa Fe, for respondents-petitioners.

## OPINION

MONTGOMERY, Chief Justice.

This is a statutory construction case. It involves two themes or approaches running through New Mexico law and relating to how a court performs the task of applying a statute when the parties to a case disagree over the statute's meaning. These approaches, though probably intended to be complementary, often seem to work at cross purposes and to call for different answers to the question.

The first approach, relied on by the Court of Appeals in the decision reviewed here on certiorari, *State ex rel. Helman v. Gallegos,* 114 N.M. 414, 839 P.2d 624 (Ct.App.1992), is often called the "plain meaning" rule. The Court of Appeals summarized this approach as follows: " 'State statutes are to be given effect as written and, where they are free from ambiguity, there is no room for construction; where the meaning of statutory language is plain, and words used by the legislature are free from ambiguity, there is no basis for interpreting the statute....' " *Id.* at 416, 839 P.2d at 626 (quoting *Johnson v. Francke,* 105 N.M. 564, 566, 734 P.2d 804, 806 (Ct.App.1987)).

The second theme might be called the "rejection-of-literal-language" approach. It was quoted by the Court of Appeals in the opinion below, but not followed, as follows:

"Courts will not add words except where necessary to make the statute conform to

the obvious intent of the legislature, or to prevent its being absurd. But where the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity or contradiction, the statute will be construed according to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others."

*Id.* at 417, 839 P.2d at 627 (quoting *State v. Nance,* 77 N.M. 39, 46, 419 P.2d 242, 247 (1966), *cert. denied,* 386 U.S. 1039, 87 S.Ct. 1495, 18 L.Ed.2d 605 (1967)).

The specific issue in the present case turns on the meaning of a section in the 1987 recodification of the Public Employees Retirement Act (cited below) and relates to whether that section was, as the Court of Appeals held, "clear and unambiguous," or whether it was ambiguous, and in fact internally inconsistent, so that judicial interpretation is necessary to effectuate the legislature's intent. The case was brought as a mandamus action in the District Court of Santa Fe County on behalf of a class of retired public employees ("the retirees") who claimed that they had been required to pay too much to purchase certain retirement benefits and who obtained a judgment directing that the Public Employees Retirement Board ("the Board") refund eleven-twelfths of the amounts they had paid. In holding that the statutory meaning was plain and that interpretation was therefore not required, or even permitted, the Court of Appeals agreed with similar conclusions by the district court and affirmed the judgment. *Id.* at 416, 839 P.2d at 626. We reach the opposite conclusions and, construing the statute in the manner advocated by the Board, reverse.

## I.

State and other public employees in New Mexico receive retirement benefits through a program established under the Public Employees Retirement Act, NMSA 1978, Sections 10–11–1 to –140 (Repl.Pamp.1992) ("the Act"). The Act provides that participating employees, who are members of the Public Employees Retirement Association ("PERA") (referred to in the Act as "members"), earn credit toward retirement through periods of service with their employers and may retire and receive a pension when they have met certain age and service credit requirements. *See* § 10–11–8.

In 1986, the New Mexico Legislature enacted legislation to encourage early retirement by public employees. The legislation appeared in an amendment to the Act, 1986 N.M.Laws, ch. 89, §§ 1–4 (compiled as NMSA 1978, §§ 10–11–14.1 to –14.4 (Cum. Supp.1986)), the purpose of which, according to its title, was to effect the voluntary early retirement "during a one-year period" of public employees meeting certain requirements. One of those requirements was that the employee desiring to retire elect in writing to purchase up to five years of service credit; another was that the employee's election "actually effectuate[ ] the member's retirement *during the seventy-fifth fiscal year.*" 1986 N.M.Laws, ch. 89, §§ 3(A), (B) (compiled as NMSA 1978, §§ 10–11–14.3(A), (B) (emphasis added)).[1] The amendment provided that "the cost of purchasing the service credit ... is computed by the retirement board based on the member's *average annual earnings* for the five years immediately prior to the member's election in writing to purchase the service credit at the combined rate of both the employer and employee contributions applicable to and in effect for that member." *Id.* § 3(D) (compiled as § 10–11–14.3(D)) (emphasis added). The phrase "average annual earnings" was not defined in Chapter 89 or elsewhere in the Act as it existed at that time.

The effect of Section 3 of the 1986 amendment (Chapter 89) was to allow employees to

---

1. In New Mexico legislation, fiscal years begin on July 1 and end on June 30 of the following year, and are numbered (with respect to the beginning of the year) according to the number of years that have elapsed since 1911—the year before New Mexico was admitted to statehood.

*See* NMSA 1978, § 6–10–1 (Repl.Pamp.1988) (year beginning July 1, 1925, shall be known as fourteenth fiscal year). The seventy-fifth fiscal year covered the period July 1, 1986, through June 30, 1987.

purchase a year of service credit at a cost computed by multiplying the employee's average annual earnings over a five-year period by the combined employer and employee contribution rates applicable to the employee.

In the following year, the legislature enacted a comprehensive revision and recodification of the Act. 1987 N.M.Laws, ch. 253, §§ 1–143 (compiled as NMSA 1978, §§ 10–11–1 to –138 (Repl.Pamp.1987)). This recodification appeared in an act consisting of 143 sections and occupying almost 100 pages in the 1987 session laws. Its effective date was July 1, 1987. 1987 N.M.Laws, ch. 253, § 143. The recodification repealed the 1986 amendment, *id.* § 140, and replaced it with a substantially similar provision allowing public employees to purchase service credit toward retirement, *id.* § 139. The outcome of this lawsuit turns on the meaning of Section 139.

Section 139 read in its entirety as follows:

Section 139. TEMPORARY PROVISION—PURCHASE OF CREDITED SERVICE.—A member may purchase not more than five years of credited service *during the seventh-fifth or seventy-sixth fiscal year* subject to the following conditions:

A. the member has five or more years of credited service acquired as a result of personal service rendered in the employ of an affiliated public employer;

B. the member reinstates all forfeited credited service;

C. the purchase *cost for each year* of credited service purchased under the provisions of this section is an amount equal to the member's *final average salary* multiplied by the sum of the member contribu-

tion rate and the employer contribution rate for the coverage plan applicable to the member; and

D. the purchase cost shall be paid to the association in one payment and the member shall retire the first day of the month following payment of the purchase cost.

1987 N.M.Laws, ch. 253, § 139 (emphasis added).[2]

As noted above, the requirements in Section 139 for an employee's purchase of up to five years of credited service (in the seventy-sixth fiscal year) were substantially similar to the requirements in Section 3 of the 1986 amendment (applicable to the seventy-fifth fiscal year); but there was an important difference, which formed the basis for the present litigation. Whereas Section 3 of the 1986 amendment had defined the employee's cost for such a purchase in terms of the employee's "average annual earnings" for the five years immediately prior to the employee's election to purchase the credit (at the combined employer and employee contribution rates applicable to the employee), Section 139 provided that the cost for each year of purchased credited service was to be an amount equal to the employee's "final average salary" (also multiplied by the combined employee and employer contribution rates applicable to the employee). Critically, the term "final average salary" was defined in Section 24 of the 1987 recodification (fifty-six pages earlier) as a *monthly* figure: "Under [the applicable coverage plan], the final average salary is one thirty-sixth of the greatest aggregate amount of salary paid a member for thirty-six consecutive months of credited service." 1987 N.M.Laws, ch. 253, § 24 (compiled as § 10–11–24 (Repl.Pamp.1987)).[3]

**2.** Apparently because it was a "temporary provision," Section 139 was not compiled with the rest of the recodification in the 1987 Replacement Pamphlet of the New Mexico Statutes Annotated, 1978 Compilation. The section was designated as a temporary provision, obviously, because it was to be effective for only one year—the seventy-sixth fiscal year (July 1, 1987, to June 30, 1988).

**3.** Section 24 made provision for an employee with less than 36 months of credited service, providing that in such a case the employee's final average salary was "the aggregate amount of salary paid a member for the member's period of credited service divided by the member's credited service."

The term "final average salary" was used, according to our count, in 36 different sections of the 1987 recodification. It was used, generally,

The terms "member contribution rate" and "employer contribution rate" in Section 139 were defined, respectively (for the coverage plan applicable to all retirees in the present action), in Sections 25 and 26 of the recodification, *id.* §§ 25, 26 (compiled as §§ 10–11–25 and –26 (Repl.Pamp.1987)). It is undisputed that that combination produced a figure of 20.01 percent. Thus, Section 139(C) yielded a straightforward computation of a prospective retiree's purchase cost for a year of purchased credited service: an amount equal to his or her final average salary (a monthly figure, defined in Section 24) times 20.01 percent. Read literally, therefore, Section 139 allowed employees to purchase one year of service credit at a cost of one month's salary times 20.01 percent, or one-twelfth of the cost applicable in the preceding year.

Before the 1987 recodification went into effect, the Board, which administers the Act, became aware of the reduced purchase cost associated with a literal reading of Section 139. Believing that the legislature had not intended this result, the Board promulgated a regulation providing that service credit was to be purchased proportionately, so that no employee could purchase one year of service credit for less than an amount determined by multiplying the employee's final average salary (as defined in Section 24 of the recodified Act) times the combined employer and employee contribution rates multiplied by twelve. PERA Rule 1300.10(C). The regulation took effect on July 1, 1987, the day on which the 1987 Act became effective.

From July 1, 1987, to June 30, 1988, the Board calculated the purchase cost of additional service credits pursuant to Rule 1300.-10. During that time, 415 public employees retired, paying a total purchase price of $5.7 million for additional retirement benefits

worth $32.6 million. Two of these 415 employees were Leonard Helman and Robert Vigil. They both paid for service credits under written protest, claiming that the cost of the credits they purchased should have been one-twelfth of the amounts they were charged. Another employee, Francis West, also filed a written protest, but did not purchase any service credit, allegedly because the purchase cost was too high.

On January 13, 1989, Helman, Vigil, and West filed a petition for a writ of mandamus in the district court. Helman and Vigil sought to compel the Board to refund them eleven-twelfths of the cost of the service credits they had purchased, and West sought to compel the Board to sell him service credit at one-twelfth of the price contemplated by the Board's regulation. Petitioners also sought to have their action certified as a class action on behalf of former state employees who were similarly situated. The district court certified a class of 237 retirees, of whom 128, in addition to the three petitioners, ultimately opted (under New Mexico's class-action rule, SCRA 1986, 1–023 (Repl. Pamp.1992)) to join the lawsuit.

At trial, the Board presented evidence that the purpose of the 1987 recodification was to standardize terms throughout the Act and thereby to integrate the various provisions of the complicated Act. The drafters (employees and other representatives of the Board) testified that they had not intended to reduce the cost of purchasing service credit from what it had been in the previous fiscal year and that such a result was inadvertent and due to the use of the new standardized terms in the Act.[4] The Board introduced documents, which the trial court received in evidence, consisting in part of documents actually submitted to and considered by the legisla-

---

to calculate the amount of an employee's retirement pension. *See, e.g.,* §§ 10–11–23, –29, –35 (Repl.Pamp.1987). The Board maintains, and the trial court received evidence tending to show, that the use of the term in Section 139 was inadvertent and the result of a drafting error.

4. In mentioning the testimonial evidence received by the trial court, we wish to make clear that we do not rely to any extent on the state-

ments of the drafters, made after passage of the legislation in question, concerning their intent (or lack of it). As discussed below, the *only* extrinsic evidence we consider in this opinion, to assist in clarifying the ambiguity we find in Section 139, is the contemporaneous documents submitted to and considered by the legislature at the time of enactment of the legislation.

ture or legislative committees in connection with enactment of the legislation and tending to show that the recodification was not expected to have any significant fiscal impact.

The trial court found that the drafters had, in fact, not intended to allow employees to purchase a year of service credit at a reduced cost calculated by using one month of combined employer and employee contributions. Nevertheless, the court determined that because the language of Section 139 was not ambiguous, absurd, or contradictory, "New Mexico case law prohibits the [c]ourt from interpreting, resorting to legislative history, or redrafting the language to conform it to reason or common sense, even though the evidence was that the drafters of the legislation did not intend the result required by the language." The court also ruled that Rule 1300.10 was unlawful because it contradicted the plain statutory formula for calculating purchased service credit. Accordingly, the court granted a permanent writ of mandamus, entered a declaratory judgment, and ordered refunds of eleven-twelfths of the amounts that Helman, Vigil, and the other class members had paid for the service credits they had purchased. The court also ordered the Board to allow Vigil and West to purchase at the reduced cost additional credits for which they had been eligible.

In affirming the trial court's decision, the Court of Appeals rejected the Board's argument that Section 139 was absurd because it allowed employees to purchase $100 worth of service credit for $1.46—i.e., one-twelfth of the cost to employees who had purchased credit in the year before. 114 N.M. at 417, 839 P.2d at 627. The Court analyzed the section and concluded that it was neither ambiguous nor absurd and did not contradict any clearly expressed legislative intent, *id.* at 416–18, 839 P.2d at 626–28, although the Court recognized "that the representatives of [the Board] responsible for drafting the legislation in question clearly intended that Section 139 be a continuation of the previous year's buyout provision which based purchase cost on the member's annual salary[,]" *id.* at 419, 839 P.2d at 629. Characterizing

the resulting legislation as an "apparent error" and a possible "mistake" and acknowledging that it might result in a "possible windfall" to the retirees, *id.* at 419–20, 839 P.2d at 629–30, the Court held that "the plain and unambiguous language of the legislation does not allow for judicial interpretation" and that the Court would therefore not engage in statutory construction, *id.* at 414–15, 839 P.2d at 624–25.

## II.

Both this Court and the Court of Appeals have decided cases using both approaches referred to at the beginning of this opinion. For the "plain meaning" rule, *see, e.g.,* in the Court of Appeals, *Johnson v. Francke* (quoted above); *Montez v. J & B Radiator, Inc.,* 108 N.M. 752, 756, 779 P.2d 129, 133 (Ct. App.), *cert. denied,* 108 N.M. 771, 779 P.2d 549 (1989); *State v. Mobbley,* 98 N.M. 557, 558, 650 P.2d 841, 842 (Ct.App.1982). This Court has articulated the same approach in, *e.g., State v. Jonathan M.,* 109 N.M. 789, 790, 791 P.2d 64, 65 (1990) ("When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation."); *Perea v. Baca,* 94 N.M. 624, 627, 614 P.2d 541, 544 (1980) ("If there is any doubt as to the meaning of the words, we are permitted to interpret by looking to legislative intent, but otherwise, we should not."); *State v. Elliott,* 89 N.M. 756, 757, 557 P.2d 1105, 1106 (1977) ("Statutes are to be given effect as written and, where free from ambiguity, there is no room for construction.").

Cases manifesting, or at least expressing, a willingness to depart from the literal wording of a statute also appear frequently in the caselaw of this state. The prime example in the Court of Appeals is *D'Avignon v. Graham,* 113 N.M. 129, 131, 823 P.2d 929, 931 (Ct.App.1991) (Although legislative intent is first sought by reference to statute's plain meaning, "both this court and the New Mexico Supreme Court have rejected formalistic and mechanistic interpretation of statutory language."). *See also, e.g., State v. Gutier-*

*rez,* 115 N.M. 551, 552, 854 P.2d 878, 879 (Ct.App.) ("Where the literal language of a statute leads to an absurd result, ... we may construe the statute to avoid such a result."), *cert. denied,* 115 N.M. 545, 854 P.2d 872 (1993); *Fierro v. Stanley's Hardware,* 104 N.M. 401, 407, 722 P.2d 652, 658 (Ct.App. 1985) ("If the language of a statute renders its application absurd or unreasonable, it will be construed according to its obvious spirit or reason.").

This Court has sounded the same theme many times, beginning as long ago as 1892. *See Cortesy v. Territory,* 6 N.M. 682, 690–91, 30 P. 947, 949 (1892) ("And, if it should transpire that the invoking of this principle would lead to palpable absurdities [and] convict the legislature of imbecility, ... must it not cause us to pause and consider if there are not other principles which might be applicable, which would not lead to such results?"). *See also, e.g., State v. Nance,* 77 N.M. at 46, 419 P.2d at 247 (saying, in addition to the paragraph quoted at the beginning of this opinion, "Not only must the legislative intent be given effect, but the court will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the legislature."); *Incorporated County v. Johnson,* 108 N.M. 633, 634, 776 P.2d 1252, 1253 (1989) ("While normally bound to follow legislative definitions, we are not so bound when a particular definition would result in an unreasonable classification. In such a case, we look to the intent of the language employed by the legislature rather than to the precise definition of the words themselves."); *National Council on Compensation Ins. v. New Mexico State Corp. Comm'n,* 103 N.M. 707, 708, 712 P.2d 1369, 1370 (1986) ("[C]ourts may substitute, disregard or eliminate, or insert or add words to a statute, if it is necessary to do so to carry out the legislative intent or to express the clearly manifested meaning of the statute.").

Even in the very recent past, this Court has reaffirmed its adherence to both these lines of authority for applying a statute whose meaning is claimed to require one result or another. *Compare Anadarko Petroleum Corp. v. Baca,* 117 N.M. 167, 169, 870 P.2d 129, 131 (1994) (quoting *State v. Jonathan M.*) *with Draper v. Mountain States Mut. Casualty Co.,* 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994) ("If the language of the statute is clear and unambiguous it is to be given effect, with the exception that 'the intention of the lawmaker will prevail over the literal sense of the terms, and its reason and intention will prevail over the strict letter.'") (quoting *Martinez v. Research Park,* 75 N.M. 672, 677, 410 P.2d 200, 203 (1965)).

■ Although in this opinion we follow the second of these two lines of authority and reject the position advocated by the petitioners below, adopted by the trial court and the Court of Appeals, that the courts were bound by the "plain and unambiguous" meaning of Section 139 and that there was no room for judicial interpretation, we do not repudiate the first line of authority. As suggested at the beginning of this opinion, the two approaches, correctly understood, can be viewed as complementary, not contradictory. That is, if the meaning of a statute is truly clear—not vague, uncertain, ambiguous, or otherwise doubtful—it is of course the responsibility of the judiciary to apply the statute as written and not to second-guess the legislature's selection from among competing policies or adoption of one of perhaps several ways of effectuating a particular legislative objective. As this Court has long recognized:

> "A statute must be read and given effect as it is written by the Legislature, not as the court may think it should be or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration.... Courts must take the act as they find it and construe it according to the plain meaning of the language employed."

*Perea v. Baca,* 94 N.M. at 627, 614 P.2d at 544 (quoting *Burch v. Foy,* 62 N.M. 219, 223, 308 P.2d 199, 202 (1957)) (alteration in original).

■ But courts must exercise caution in applying the plain meaning rule. Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning. In such a case, it can rarely be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning. While—as in this case—one part of the statute may appear absolutely clear and certain to the point of mathematical precision, lurking in another part of the enactment, or even in the same section, or in the history and background of the legislation, or in an apparent conflict between the statutory wording and the overall legislative intent, there may be one or more provisions giving rise to genuine uncertainty as to what the legislature was trying to accomplish. In such a case, it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute. *See Perea,* 94 N.M. at 627, 614 P.2d at 544 (courts are permitted to interpret by looking to legislative intent if there is *any doubt* as to the meaning of the words) (emphasis added); *State v. Herrera,* 86 N.M. 224, 225–26, 522 P.2d 76, 77–78 (1974) (statute construed based on perceived legislative object and purpose, rather than on literal language); *see also Swink v. Fingado,* 115 N.M. 275, 284, 850 P.2d 978, 987 (1993) (legislature's intent in enacting a statute means the purpose of the law—the objective the legislature has sought to accomplish).

This point is emphasized by one of the authorities the Court of Appeals cited in its opinion below in support of its adoption of the plain meaning rule. The Court quoted a well-known treatise on statutory construction, stating: " 'A frequently encountered rule of statutory interpretation asserts that a statute, clear and unambiguous on its face, need not and cannot be interpreted by a court....' " 114 N.M. at 416, 839 P.2d at 626 (quoting 2A Norman J. Singer, *Statutes and Statutory Construction* § 45.02, at 5 (5th

ed. 1992)). While the Singer treatise does indeed make this statement, and in fact goes on to say that "only statutes which are of doubtful meaning are subject to the process of statutory interpretation[,]" a few lines later appear the following observations:

> However, this rule is deceptive in that it implies that words have intrinsic meanings. A word is merely a symbol which can be used to refer to different things. Difficult questions of statutory interpretation ought not to be decided by the bland invocation of abstract jurisprudential maxims.... It is impossible to determine the referent of the word without a knowledge of the facts involved in its use....
>
> The assertion in a judicial opinion that a statute needs no interpretation because it is "clear and unambiguous" is in reality evidence that the court has already considered and construed the act.

2A Singer, *supra,* § 45.02, at 5–6.

■ In their answer brief in the Court of Appeals and in their response to the Board's petition for certiorari in this Court, the retirees have inveighed against the possibility that this Court might indulge in "judicial legislation" by "rewriting" Section 139 to conform to the Board's position. The Court of Appeals expressed its own sensitivity "to the constitutional requirement of separation of powers," saying: "We believe concerns for consistency and deference to another branch of government outweigh any temptation to rectify what might have been a mistake." 114 N.M. at 419–20, 839 P.2d at 629–30. But, as already indicated, we believe it to be the high duty and responsibility of the judicial branch of government to facilitate and promote the legislature's accomplishment of its purpose—especially when such action involves correcting an apparent legislative mistake. *See* 2A Singer, *supra,* § 45.12, at 61 ("For example, typographical errors can be disregarded and a statute or ordinance can be interpreted in a manner that elucidates the statute's true meaning."); *see also Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed.

1153 (1952) (concurring opinion of Jackson, J.) ("While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.").

And so we return to the Court of Appeals' own words, uttered in another case—words which we believe provide the proper orientation that a court should bring to resolution of a dispute which turns on the purportedly plain meaning of a statute. The Court quoted Judge Learned Hand's concurring opinion in *Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir.1944), as follows:

> "There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final."

*D'Avignon v. Graham*, 113 N.M. at 131, 823 P.2d at 931. The Court of Appeals continued with a passage from a New Mexico case that is equally applicable to the case before us now: "In a comprehensive statute such as this, harmony and consistency, while greatly to be desired, are not always found. A momentary lapse from them may easily be given too much weight in interpretation." *Id.* (quoting *McFadden v. Murray*, 32 N.M. 361, 367, 257 P. 999, 1002 (1927)).

### III.

■ We now apply these principles to the case before us. Despite the clarity and precision of its formula for computing the cost of a retiring employee's additional purchased service credit, Section 139 was ambiguous. It was ambiguous because of its reference to the seventy-fifth fiscal year (the twelve-month period ending June 30, 1987), which had already ended when Section 139 became effective on July 1, 1987. The section provided that an employee could purchase up to five years of credited service "during the seventy-fifth or seventy-sixth fiscal year," subject to various conditions. Why did the section refer to the seventy-fifth fiscal year, and why did it couple that reference with a reference to the seventy-sixth fiscal year, the year during which Section 139 was to be effective?

■ The reference to the seventy-fifth fiscal year not only introduced an element of ambiguity into the statute; it also provided the basis upon which a court (this Court, the Court of Appeals, or the district court) could determine the true legislative intent with respect to the disputed issue—the purchase cost for additional service credit.

In other words, not only was the statute ambiguous by referring to both the seventy-fifth and seventy-sixth fiscal years at the same time; it was also, if it meant what the petitioners below argued it meant, internally inconsistent. The cost for an additional year of service credit had already been fixed by Section 3 of the 1986 amendment (Chapter 89), and no one argues that Section 139 was intended to *change* that cost, retroactively, to comport with the formula spelled out later in the section. Yet, if the retirees' (and the lower courts') argument is accepted, then Section 139 specified a different formula for calculating the cost of an additional year of service credit—a formula that contradicted the one previously prescribed by the legislature in the 1986 amendment.

The Court of Appeals swept aside this anomaly, saying:

> We fail to see how the addition of the 'seventy-fifth ... fiscal year' in any way affects the computation of cost to Petitioners. Inclusion of the phrase 'seventy-fifth ... fiscal year' might arguably have some effect on purchases of credit in that year; however, that issue is not before the court.

We are only concerned with employees who purchased or attempted to purchase service credit during the 76th fiscal year.

114 N.M. at 417, 839 P.2d at 627.

The Court of Appeals thus refused to accord any effect at all to the reference to the seventy-fifth fiscal year. Similarly, the retirees argued in the Court of Appeals, and renew the argument here, that "there was no conceivable meaning to this reference [to the seventy-fifth fiscal year].... Laws that take effect in the 76th fiscal year cannot impact events in the 75th. [The Board has] not explained how words that are, under any circumstances, meaningless, can demonstrate ambiguity in other words that are not ambiguous."

The retirees' argument that the reference to the seventy-fifth fiscal year in Section 139 was meaningless runs headlong into another favored canon of statutory construction—the maxim that the legislature is presumed not to have used any surplus words in a statute; each word is to be given meaning. *State v. Doe*, 90 N.M. 776, 777, 568 P.2d 612, 613 (Ct.App.1977). *See also State ex rel. Klineline v. Blackhurst*, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988) (all parts of statute must be read together to produce harmonious whole); *Quintana v. Department of Corrections*, 100 N.M. 224, 225, 668 P.2d 1101, 1102 (1983) (all provisions of a statute must be read together to ascertain legislative intent).

The retirees speculate that Section 139's reference to the seventy-fifth fiscal year may have been intended to change the terms applicable to those who might purchase service credits in the seventy-sixth fiscal year from the terms that would have applied had they purchased the credits in the preceding year. Yet nothing in the section or elsewhere in the recodified Act, except the new statutory formula (which, as the Court of Appeals suggested, was an "apparent error"), gives any indication that the legislature was contemplating this kind of change—a change that clearly would have entailed a significant fiscal impact. The documents contemporaneous with the legislature's consideration of Section 139 and the rest of the 1987 recodification reveal that the recodification was presented to the legislature as having no negative financial impact. Among these documents, a number of which the trial court received in evidence, was an analysis of the recodification prepared by the PERA's general counsel and submitted to the Legislative Finance Committee and the Department of Finance and Administration. In a section entitled "Summary of Notable Changes," the document discussed the effect of using "final average salary" in calculating the cost of purchasing credited service, but did not mention that use of this term would bring an eleven-twelfths reduction in the cost of credited service. The document stated: "The Recodification ... has a positive fiscal impact." Another document was a fiscal impact report prepared by a fiscal analyst for the Legislative Finance Committee, for the Committee's use, which thoroughly discussed the fiscal implications of the recodification but did not mention an eleven-twelfths reduction in the purchase price of credited service.

The Court of Appeals in its opinion below accepted the proposition, based on the documents, that the recodification was expected to have no financial impact, 114 N.M. at 419, 839 P.2d at 629, although it expressly refrained from ruling on the admissibility of the documents, *id.* at 418, 839 P.2d at 628. The retirees objected at trial to the trial court's consideration of these documents, and they have renewed their objection on appeal.

■ Although not central to our analysis of the meaning of Section 139, we see no reason why *contemporaneous* documents, presented to and presumably considered by the legislature during the course of enactment of a statute, may not be considered by a court in attempting to glean legislative intent. We have previously said:

[I]n determining legislative intent it is proper to look to the legislative history of · an act or contemporaneous statements of legislators while the legislation was in the process of enactment. Statements of legis-

lators, *after* the passage of the legislation, however, are generally not considered competent evidence to determine the intent of the legislative body enacting a measure.

*United States Brewers Ass'n v. Director of N.M. Dep't of Alcoholic Beverage Control,* 100 N.M. 216, 218–19, 668 P.2d 1093, 1095–96 (1983), *appeal dismissed,* 465 U.S. 1093, 104 S.Ct. 1581, 80 L.Ed.2d 115 (1984) (citations omitted). *Accord Claridge v. New Mexico State Racing Comm'n,* 107 N.M. 632, 639–40, 763 P.2d 66, 73–74 (Ct.App.) (approving use of "legislative history" and "contemporaneous" statements by legislators but disapproving use of statements by legislators made after statutory enactment), *cert. denied,* 107 N.M. 413, 759 P.2d 200 (1988). Other states have considered contemporaneous reports and documents considered by their legislatures or legislative committees to assist in deducing legislative intent. *See, e.g., People v. Tanner,* 24 Cal.3d 514, 156 Cal.Rptr. 450, 452–53, 596 P.2d 328, 330–31 (1979) (approving use of legislative history and staff memoranda prepared contemporaneously with drafting of statute); *Shapiro v. Essex County Bd. of Chosen Freeholders,* 177 N.J.Super. 87, 424 A.2d 1203, 1206–07 (1980) (approving use of legislative history and "reports of special committees or commissions appointed to study and suggest legislation"), *aff'd,* 183 N.J.Super. 24, 443 A.2d 219 (App.Div.), *aff'd,* 91 N.J. 430, 453 A.2d 158 (1982); *Ball v. District No. 4, Area Bd. of Vocational, Technical & Adult Educ.,* 117 Wis.2d 529, 345 N.W.2d 389, 396–97 (1984) (approving use of contemporaneous documents by legislatively created committee, although legislators not permitted to testify to intent of legislature when law passed).

█ We do not necessarily embrace the holdings in the foregoing out-of-state cases, and we confine our ruling to the facts of the instant case, expressly restricting consideration of this type of extrinsic evidence to cases in which the statutory meaning is unclear—which, as we have held, Section 139 most definitely was. We hold only that the trial court properly admitted contemporane-

ous documents, actually submitted to the legislature, for the purpose of determining whether any of the revisions to the Act was expected to have a significant fiscal impact. The negative answer to this question supplied by the documents supports our conclusion that Section 139 was not intended to alter the formula for computing a retiring employee's cost of purchasing additional service credit as originally enacted in Section 3 of the 1986 amendment.

Another consideration supporting our conclusion is the discrimination between employees purchasing service credit under Section 139 and those who purchased under Section 3 of the 1986 amendment that would result if Section 139 were applied as the retirees advocate. Although, as argued by the retirees, retirement statutes, including the New Mexico Act, frequently draw distinctions among various groups of employees in fixing the amounts of benefits to which they will become entitled on retirement and in setting the costs for those benefits to be paid during employment, the unequal treatment afforded to employees who purchased service credit under Section 3 of the 1986 amendment versus those who purchased under the same program one year later, under the retirees' view of the later statute, raises the serious question why the legislature would have intended to impose such disparate treatment. *See City of Miami Beach v. Cleary,* 75 So.2d 792, 795 (Fla.1954) (statutory construction of public employee retirement acts should avoid inequitable results favoring one member over another). It may be, as the Court of Appeals speculated in its opinion below, 114 N.M. at 417, 839 P.2d at 627, that the legislature, which in 1986 had authorized the purchase of $100 worth of service credit for $17.57, wished to increase, twelve-fold, the incentive for public employees to retire early by lowering the cost of that same purchase to $1.46. But such a drastic reduction in state revenues to continue the same program begun one year earlier, with no suggestion by anyone that there would be a significant fiscal impact, should at least have alerted the lower courts to the possibility that an ambiguity was masquerading behind Section 139's otherwise plain meaning.

Finally, we address the validity of PERA Rule 1300.10. Clearly, if Section 139 were as

clear and unambiguous as the lower courts held it was, the regulation implementing the Board's reading of the statute would have been invalid. Equally clearly, as the retirees argue, if the statute unambiguously meant what the Board said it did, there would have been no need for Rule 1300.10 and it would have served no purpose (except perhaps to restate the existing law in a convenient place for public employees' easy reference). But what if the law was unclear? What if it contained a *mistake,* a drafting error, that everyone knew ran contrary to the legislature's intent in extending what was originally a one-year program into a second year—a mistake, moreover, that was apparent on the face of the statute?

In this situation, we believe that the Board acted within its authority "to carry out and effectuate the purposes" of the Act, as contemplated by Section 10–11–130(A) (Repl.Pamp.1987). Rule 1300.10 was therefore a legislatively authorized regulation that had the force of law. *See Jaramillo v. Fisher Controls Co.,* 102 N.M. 614, 619, 698 P.2d 887, 892 (Ct.App.), *cert. denied,* 102 N.M. 613, 698 P.2d 886 (1985). The Board's interpretation of this ambiguous statute was entitled to be given "substantial weight" by the reviewing courts. *See State ex rel. Battershell v. City of Albuquerque,* 108 N.M. 658, 662, 777 P.2d 386, 390 (Ct.App.1989). We therefore hold that, given the statutory milieu in which Section 139 was enacted, it was a valid interpretation by the agency empowered to interpret it.

For the foregoing reasons, the decision of the Court of Appeals is reversed, and the cause is remanded to the district court with instructions to enter a new judgment dismissing the retirees' petition with prejudice. No costs are awarded; the parties shall bear their own costs and attorney's fees in this Court, in the Court of Appeals, and in the trial court.

**IT IS SO ORDERED.**

RANSOM, BACA, FRANCHINI and FROST, JJ., concur.