WECHSLER, Judge (dissenting). {27} I respectfully dissent from the majority opinion. I disagree with Part A and its exclusion of the stimulants methamphetamine and amphetamine from use in Section 52-1-12 of the WCA. Because I believe that the Legislature intended to include methamphetamine and amphetamine in the DDCA and, thus, intended for those drugs to be used in application of Section 52-1-12 of the WCA, I would reach the question raised by Plaintiff of whether Worker’s use of illegal drugs was the sole cause of the accident that caused his death. I believe that sufficient evidence supports the WCJ’s determination that Worker’s use of illegal drugs was the sole cause, and I would thus affirm the WCJ’s decision. In so affirming, I would not reach the questions analyzed in Parts B and C of the majority opinion. {28} The majority cites Maestas, 2007-NMSC-001, ¶ 21, 140 N.M. 836, 149 P.3d 933, for the proposition that the Legislature is presumed to be aware of existing statutes when it enacts new statutes. I agree with the majority on this point. However, Maestas also evaluated the legislative history and the statutory context in which the relevant statute was enacted to arrive at its conclusion. Id. ¶¶ 22, 24. State ex rel Helman v. Gallegos, 117 N.M. 346, 352-53, 871 P.2d 1352, 1358-59 (1994), guides us in those situations, such as the present one, in which a statute’s plain reading becomes muddled when reviewing statutory context and legislative history. “[I]f the meaning of a statute is truly clear[,] it is of course the responsibility of the judiciary to apply the statute as written and not to second-guess the [Legislature's selection from among competing policies.” Id. at 352, 871 P.2d at 1358. However, Gallegos warns that “courts must exercise caution in applying the plain meaning rule [because fit’s beguiling simplicity may mask a host of reasons why a statute ... may for one reason or another give rise to legitimate ... differences of opinion concerning the statute’s meaning.” Id. at 353, 871 P.2d at 1359. “In such a ease, it is part of the essence of judicial responsibility to search for and effectuate the legislative intent — the purpose or object — underlying the statute.” Id. Our Supreme Court’s warning in Gallegos speaks directly to the situation at hand. {29} The plain meaning of Section 52-1-12 indicates that there is a definition of “depressant, stimulant or hallucinogenic drug” in the DDCA that would prohibit an employer from paying compensation under the WCA. Section 52-1-12 (“No compensation is payable from any employer ... if the injury to the person claiming compensation was occasioned solely by the person being under the influence of a depressant, stimulant or hallucinogenic drug as defined in the [DDCA].”). However, as discussed in the majority opinion, the DDCA no longer expressly includes such a definition of “depressant, stimulant or hallucinogenic drug.” The majority therefore states that to read a nonexistent definition of “depressant, stimulant, and hallucinogenic drug” into Sections 52-1-12 and 52-1-12.1 would be to engage in “impermissibly broad construction.” Thus, the majority excludes methamphetamine and amphetamine from use in those sections. {30} Although I agree that it is not the place of the courts to act as legislating bodies, I do not agree that including methamphetamine and amphetamine as stimulants in the application of Sections 52-1-12 and 52-1-12.1 would be to do so. Section 52-1-12 is a statute that appears clear in its meaning when it bars recovery under the WCA if a “depressant, stimulant or hallucinogenic drug,” as defined in the DDCA, is the sole cause of an accident. However, the Legislature’s removal of the definition of “depressant, stimulant or hallucinogenic drug” from the predecessor to the DDCA has presented “an apparent conflict between the statutory wording and the overall legislative intent.” See Gallegos, 117 N.M. at 353, 871 P.2d at 1359. As such, we need to discern and give effect to the Legislature’s intent in the statutes. See id. {31} Not only is the legislative intent of Section 52-1-12 clear, but the Legislature, when returning to Section 52-1-12 in 1989, did not change the reference to the DDCA, even though it had previously removed the definition referenced. Through Section 52-1-12, the Legislature’s intent continued to be that if one of the drugs within the definition caused an accident, recovery under the WCA would be barred notwithstanding the previous removal of the definition. The Legislature’s subsequent enactment of Section 52-1-12.1, which also references the previously removed definition, further demonstrates the Legislature’s intent that the removed definition would still be applied to the WCA. {32} I believe that the Legislature committed oversight when it removed the specific definitions referred to in Section 52-1-12 from the predecessor to the DDCA and did not correspondingly revise Section 52-1-12. Indeed, it apparently referred to the DDCA definitions by oversight in 1989 and 2001. However, I do not read the Legislature’s failure to revise Section 52-1-12 to alter its intent or to remove the effect of Section 52-1-12 in the present case. {33} It is our responsibility to evaluate the statutes together to give effect to the legislative intent. See Gallegos, 117 N.M. at 353, 871 P.2d at 1359. In doing so, I first view the plain legislative intent stated in the language of Section 52-1-12 to be paramount. The reference to the definitional language of the DDCA is ancillary; it merely provides the method of fulfilling the stated intent. Second, although we are frustrated in our ability to directly follow the Legislature’s reference to the definitions of the DDCA, there is sufficient linkage between the statutes to allow continued application of the definition of “stimulant” in Section 30-31-7(A)(3) to be applied to the WCA. {34} Although the DDCA does not include “depressant, stimulant or hallucinogenic drug” within its definitions, its definitions do include “controlled substances.” Section 26-1-2(D). A controlled substance is defined as “a drug, substance or immediate precursor enumerated in Schedules I through Y of the Controlled Substances Act [Sections 30-31-6 to -10].” Section 26-l-2(D). Specifically, Section 30-31-7(A)(3) includes as controlled substances the stimulants “(a) amphetamine, its salts, optical isomers and salts of its optical isomers; [and] (c) methamphetamine, its salts, isomers and salts of isomers.” Evaluating the statutes together to “effectuate the legislative intent,” Gallegos, 117 N.M. at 353, 871 P.2d at 1359, I conclude that, although the Legislature removed the definition of “depressant, stimulant or hallucinogenic drug” from the predecessor to the DDCA, the DDCA’s reference to the schedules of the Controlled Substances Act, which include a definition of the stimulants methamphetamine and amphetamine, is nevertheless sufficient for those drugs to be included in the DDCA and, by way of that link, in Section 52-1-12. Reliance on the technicality that the definition no longer exists in the DDCA does not effectuate the Legislature’s intent when it referred to the nonexistent definition in Section 52-1-12. It did not repeal Section 52-1-12. As such, I would reach the merits of Plaintiffs argument that there was not substantial evidence to support the WCJ’s conclusion that “the sole cause of Worker’s accident resulting in death was illegal drug use, pursuant to Section 52-1-12.” {35} We review for substantial evidence under a whole record standard of review. Leonard v. Payday Prof l, 2007-NMCA-128, ¶ 10, 142 N.M. 605, 168 P.3d 177. Although in analyzing the whole record, we consider evidence both favorable and unfavorable to the WCJ’s finding, we may not substitute our judgment for that of the WCJ, and we must view the evidence “in the light most favorable to the [WCJ’s] decision.” Id. (internal quotation marks and citation omitted). “We will affirm the [WCJ’s] decision if, after taking the entire record into consideration, there is evidence for a reasonable mind to accept as adequate to support the conclusion reached.” Id. (internal quotation marks and citation omitted). {36} The WCJ found that the sole cause of the accident resulting in Worker’s death was Worker’s illegal use of methamphetamine and amphetamine. Don C. Fisher, M.D., issued a report supporting this finding. Plaintiff posits that Worker was suffering from fatigue at the time of the accident that combined with his use of the illegal drugs to cause the accident. Plaintiffs expert witness, Eugenia M. Brazwell, Ph. D., stated her opinion that she could not say within a reasonable degree of probability that the drugs in Worker’s system were the sole cause of the accident. She later qualified her opinion to state that she could not “say to a hundred percent certainty it was caused by the level of drugs.” See Levarlo v. Ysidro Villareal Labor Agency, 120 N.M. 734, 738, 906 P.2d 266, 270 (Ct.App.1995) (stating that an expert’s testimony need only “reasonably connote the statutory requirement”). {37} Dr. Brazwell testified that Worker was probably in a somnolent state, which, because he did not brake, was consistent with someone who was unconscious. She testified that Worker had taken high doses of methamphetamine and amphetamine, 30 mg. or more. {38} Dr. Brazwell did not, however, directly testify about the effect of the drugs in Worker’s system. Her concern was that she could not ascertain the timing of Worker’s drug use. She did state that methamphetamine has an initial stimulant effect and that if Worker had taken the initial dose before or after he went to his job with Employer, the drug would have relieved his fatigue, exhaustion, and sleepiness. She further stated that high doses of methamphetamine over a period of days will eventually result in an inability to stay awake. She said that it was possible that Worker was a “binge user,” which is described in the scientific literature that Dr. Brazwell relied upon in forming her opinions as taking place over two or more days and eventually leading to a compulsion to sleep or an inability to stay awake. Dr. Brazwell also said that blood concentrations of more than 0.20 milligrams would indicate methamphetamine abuse. Worker had a level of 0.78 milligrams at the time of his death. {39} The WCJ was confronted with the difficult task of determining whether Worker’s fatigue was a contributing cause of the accident. Indeed, Worker had ample reason to suffer fatigue. However, with the substantial level of blood concentrations of methamphetamine and the testimony concerning the effects of methamphetamine and amphetamine abuse, the WCJ could reasonably conclude that Worker had consumed methamphetamine over a period of time, that the methamphetamine Worker consumed would have eventually resulted in a compulsion to sleep or an inability to stay awake, and that it was this consumption of the methamphetamine, rather than fatigue, that caused Worker to lose consciousness or fall asleep and was, thus, the sole cause of the accident. I believe that there was substantial evidence in the record as a whole to support the WCJ’s decision. {40} I therefore respectfully dissent.