**Certiorari Denied, February 12, 2014, No. 34,511**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-048**

**Filing Date: December 17, 2013**

**Docket No. 32,635**

**MICHELLE LYNN HAWKINS,**

> **Worker-Appellee,**

**v.**

**MCDONALD'S and FOOD INDUSTRY**
**SELF INSURANCE FUND OF NEW MEXICO,**

> **Employer/Insurer-Appellants.**

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Terry S. Kramer, Workers' Compensation Judge**

Titus and Murphy Law Firm
Victor A. Titus
Farmington, NM

for Appellee

Maestas & Suggett, P.C.
Paul Maestas
Albuquerque, NM

for Appellants

**OPINION**

**VANZI, Judge.**

**{1}** McDonald's (Employer) appeals from a compensation order entered pursuant to the Workers' Compensation Act (the WCA), NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2013). Employer contends the Workers' Compensation Judge (WCJ) erred in concluding that Michelle Hawkins (Worker) was entitled to temporary total disability (TTD)

1

and permanent partial disability (PPD) benefits after her termination for cause. We hold that termination of post-injury employment, whether or not for misconduct, does not affect an employee's right to recover TTD benefits under Section 52-1-25.1(B). Further, we hold that, under the facts of this case, Worker may continue to receive that portion of her PPD benefits attributed to physical impairment, as well as those benefits enhanced by the statutory modifiers of Section 52-1-26(C). Accordingly, we affirm the WCJ's award, although we do so on different grounds.

## BACKGROUND

**{2}** The parties do not dispute the essential facts. Worker was employed as a shift manager by Employer prior to and on May 26, 2011. Worker suffered an accident arising out of and in the course of her employment on May 26, 2011, wherein she injured her low back. Worker was released to return to work with a twenty-pound lifting limitation on May 27, 2011, and again on May 31, 2011. Employer offered and provided Worker a light/modified duty job as a shift manager that paid Worker a wage equal to or greater than her pre-injury wage of $8.50 per hour. She worked in that modified capacity for approximately four weeks until she was terminated from employment on July 13, 2011. The reasons for Worker's termination follow.

**{3}** Employer had a zero-tolerance policy in place prohibiting sexual harassment. The policy required shift managers to immediately notify certain named supervisors if the shift manager was made aware of an incident of sexual harassment. It was not the shift manager's responsibility to investigate any reports of sexual harassment or to determine the validity of the accusation.

**{4}** Sometime in May 2011, Worker's son and a friend were visiting Worker's home. The son's friend was also employed by Employer. While they were having dinner, the employee reported that she had received a sexually inappropriate message from Employer's store manager. Worker did not witness the alleged sexual harassment, nor did she see the allegedly offending text message. Further, it was Worker's opinion that, based upon her knowledge and prior experiences with the employee, the employee was not particularly trustworthy or credible. As a result, Worker did not report to Employer representatives the allegation—made at her home—of sexual harassment as required by the policy. Employer subsequently became aware of the alleged sexual harassment through other sources and performed an investigation. Employer terminated Worker's employment on July 13, 2011, for failing to report the information made available to her.

**{5}** On September 28, 2011, Worker filed a complaint seeking to recover TTD or temporary partial disability benefits accrued after her termination on July 13, 2011, as a result of the May 26, 2011 injury she sustained in the workplace accident. Worker's low-back injury reached maximum medical improvement (MMI) on January 11, 2012, at which point she was assigned a two percent whole-person impairment as a result of the injury. During the course of the proceedings, she subsequently also sought the modifier portion of

any PPD benefits that she may have been entitled to after reaching MMI.

**{6}** Following a trial, the WCJ issued a compensation order finding that Worker's termination did not disqualify her from receiving TTD benefits prior to reaching MMI and PPD benefits subsequent to reaching MMI. The WCJ found that Employer was acting within its authority when it terminated Worker for violating company policy. However, the WCJ stated, "Not every action giving rise to termination of employment is of a nature or character or quality sufficient to warrant a denial of indemnity benefits" and that, therefore, Employer could not avoid paying benefits to Worker in this case. Based upon her average weekly wage of $275.61, the WCJ awarded Worker TTD benefits at a compensation rate of $183.74 from July 14, 2011 to January 11, 2012. The WCJ also concluded that Worker was entitled to PPD benefits at "eleven percent . . . of her compensation rate commencing on January 11, 2012[,] and continuing until conclusion of the benefit period or until further order." The PPD benefits included, among other things, the two percent permanent physical impairment, plus additional modifier benefits based upon Worker's age, education, and physical capacity. Finally, the WCJ determined that Worker was entitled to ongoing reasonable and necessary medical benefits and attorney fees. This appeal followed.

**DISCUSSION**

**Standard of Review**

**{7}** The issues on appeal concern the scope of Section 51-1-25.1(B) of the WCA, which defines when a worker is entitled to TTD benefits prior to reaching MMI, and Section 52-1-26(D) of the WCA, which defines when a worker is entitled to PPD benefits after reaching MMI. We must decide whether, and to what extent, a worker's termination from post-injury employment serves to disqualify that worker from receiving either or both of these benefits.

**{8}** We review workers' compensation cases under a whole record standard of review. *Moya v. City of Albuquerque*, 2008-NMSC-004, ¶ 6, 143 N.M. 258, 175 P.3d 926. We review statutory interpretation de novo. *Kahrs v. Sanchez*, 1998-NMCA-037, ¶ 11, 125 N.M. 1, 956 P.2d 132. When construing a statute, "our guiding principle is to determine and give effect to legislative intent." *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n*, 2007-NMSC-053, ¶ 20, 142 N.M. 533, 168 P.3d 105. "[T]he plain language of a statute is the primary indicator of legislative intent. Courts are to give the words used in the statute their ordinary meaning unless the [L]egislature indicates a different intent." *Johnson v. N.M. Oil Conservation Comm'n*, 1999-NMSC-021, ¶ 27, 127 N.M. 120, 978 P.2d 327 (internal quotation marks and citations omitted). However, we also recognize that the "beguiling simplicity [of the plain meaning rule] may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352; *see Draper v. Mountain States Mut. Cas. Co.*, 1994-NMSC-002, ¶ 4, 116 N.M. 775, 867 P.2d 1157 (explaining that the intention of the Legislature will prevail over the strict meaning of

the literal language). Accordingly, "[w]e should not attribute to the [L]egislature an undue precision in drafting and thereby frustrate legislative intent when we construe a statute." *Jeffrey v. Hays Plumbing & Heating*, 1994-NMCA-071, ¶ 10, 118 N.M. 60, 878 P.2d 1009. We reiterate that "our task is not to apply language literally when it would lead to counterproductive, inconsistent, and absurd results; we must harmonize the statutory language to achieve the overall legislative purpose." *Eldridge v. Circle K Corp.*, 1997-NMCA-022, ¶ 29, 123 N.M. 145, 934 P.2d 1074.

**A Worker's Termination From Employment Does Not Limit Her Entitlement to TTD Benefits Under Section 52-1-25.1(B)**

**{9}**     Section 52-1-25.1 of the WCA limits the payment of TTD benefits to an injured worker prior to the date of MMI in only two circumstances. First, if the worker is released to return to work and the employer offers work at the worker's pre-injury wage, or if the worker accepts employment elsewhere at the worker's pre-injury wage, then "the worker is not entitled to [TTD] benefits." Section 52-1-25.1(B). Second, if the worker is released to work and the employer offers work at less than the worker's pre-injury wage, the worker is entitled to two-thirds of the difference between the pre-injury wage and the post-injury wage. Section 52-1-25.1(C).

**{10}**     Employer argues that it "complied" with the provisions of Section 52-1-25.1(B) when it offered and provided Worker a light/modified duty job after her May 26, 2011 accident at her pre-injury wage. Employer further contends that once it satisfied the requirements of Section 52-1-25.1(B), and Worker was then terminated for violating its sexual harassment policy—a reason unrelated to her injury—Worker was no longer entitled to TTD benefits.

**{11}**     The statute does not explicitly address whether an employee is entitled to benefits in a situation where she has been offered employment at her pre-injury wage and has been subsequently terminated, whether for misconduct or otherwise. The reading Employer advocates is technically consistent with the plain language of Section 52-1-25.1(B); the statute clearly says that once an employer has offered a worker a job at her pre-injury rate, the worker is "not entitled to [TTD] benefits." This reading, however, is wholly inconsistent with the policy and purpose of the WCA, and would necessarily lead to absurd and unjust results, for it would require this Court to conclude that *any* employee who is terminated can no longer receive benefits, regardless of the reason for the discharge. Accordingly, we must reject it. We explain.

**{12}**     The WCA was created to offset the lost wages of a worker injured by a work-related accident, while promoting a policy in which workers would not become dependent on state welfare programs. *See Casias v. Zia Co.*, 1979-NMCA-068, ¶ 4, 93 N.M. 78, 596 P.2d 521. Put simply, the WCA seeks to ensure that an employee is adequately compensated for income lost due to an injury, thereby enabling her to provide the necessities of life for herself and her dependents. We recognize that the WCA is a delicate balance between the rights and

4

interests of the worker and the employer, *see* NMSA, 1978, § 52-5-1 (1990), and that "any judicial analysis under the [WCA] must balance equally the interests of the worker and the employer without showing bias or favoritism toward either." *Salazar v. Torres*, 2007-NMSC-019, ¶ 10, 141 N.M. 559, 158 P.3d 449. However, without further legislative guidance, if this policy is to be effectuated, income benefits such as TTD cannot be conditioned on an injured employee's termination—for whatever reason. We believe that this is the type of case in which the literal application of the statutory language would frustrate rather than advance the Legislature's intent.

{13}     The application of Section 52-1-25.1(B)'s denial of TTD benefits makes sense when applied to an injured worker who returns to work at her full pre-injury wage. TTD benefits are not available in that situation because the worker, although still injured, is not suffering any lost wages. It makes no sense, however, when applied to an injured worker who has been discharged and is not receiving any compensation whatsoever. If it is the public policy of New Mexico that injured employees should receive payment for medical expenses and a portion of lost wages—and it is—then an employer action that prevents the employee from asserting her statutory right to compensation violates that policy, particularly when the Legislature has not spoken on the issue.[1]

{14}     Further, such an interpretation would allow employers to create a job accommodating the restrictions placed on an injured employee, pay the employee her pre-injury wage and then fire that employee, for any reason or no reason, thereby avoiding the obligation to pay benefits. No other statutory provision in the WCA serves to cut off a worker's benefits if she is terminated, and such an anomaly cannot be justified here. Even a worker who is injured on the job as a result of intoxication or drug use—unless proved to be willful or intentional conduct—only has his compensation reduced by ten percent. *See* §§ 52-1-11; 52-1-12; 52-1-12.1. Thus, to read Section 52-1-25.1(B) to allow the result urged by Employer would be too narrow a reading that would altogether thwart the WCA's purpose and operation. While we recognize that, conversely, an injured employee could intentionally violate company policy in order to get fired and yet be entitled to full TTD benefits, we are bound to construe Section 52-1-25.1(B) in favor of providing compensation to an injured worker absent clear statutory language to the contrary. It is not our place to insert language into the WCA that does not exist. That task falls to the Legislature alone.

{15}     Our case law, moreover, has required employers to pay benefits to workers who have been fired for misconduct in other factual circumstances. For example, in *Ortiz v. BTU Block & Concrete Co.*, 1996-NMCA-097, ¶ 2, 122 N.M. 381, 925 P.2d 1, the worker was repeatedly reprimanded for failing to obey instructions and for other deficiencies in her job

---

[1]We note, for example, that unlike the WCA, the Unemployment Compensation Act specifically disqualifies an individual for benefits if it is determined that the individual has been discharged for misconduct connected with the individual's employment. NMSA 1978, § 51-1-7(A)(2) (2011).

performance. The "last straw" was an accident, for which the worker sought workers' compensation benefits. *Id.* We held that the worker was entitled to full TTD benefits because her employer never extended an offer of employment under either Section 52-1-25.1(B) or (C). *Ortiz*, 1996-NMCA-097, ¶¶ 8, 13, 14. Subsequently, in *Lackey v. Darrell Julian Construction*, 1998-NMCA-121, ¶¶ 2, 19, 24, 125 N.M. 592, 964 P.2d 153, we held that the worker, who returned to work on light duty at less than his pre-injury wage after suffering two work-related accidents and was later fired for drinking beer on the job, was entitled to continue to get TTD benefits after his discharge until such time he was taken off work by his doctor.

**{16}** We cannot countenance a statutory interpretation that requires an employer to pay benefits to a worker who has been terminated under the circumstances in *Ortiz* and *Lackey* and that yet allows the employer to escape that obligation simply by offering work at the worker's pre-injury wage before she is terminated. Under such an interpretation, every injured employee who is terminated from employment would continue to receive compensation benefits except the employee who was offered a job at her pre-injury wage. Such a result cannot be harmonized with the WCA's purpose and cannot be what the Legislature intended. *See Eldridge*, 1997-NMCA-022, ¶ 29.

**{17}** The more difficult question to answer is the amount of TTD benefits due a worker who was making a pre-injury wage under Section 52-1-25.1(B) and who has been terminated. Again, the statute is silent. We are left with two choices—either the employee receives full TTD benefits or none at all. Because there is no principled basis upon which to deny wage loss benefits in whole or in part, we conclude that a terminated employee is entitled to her full TTD benefits. Accordingly, the WCJ in this case properly awarded Worker her compensation rate provided by the statute and without any disqualification or reduction as a result of the termination.

**{18}** Employer's reliance on *Lackey* is unavailing, and we reject its characterization of that decision. *Lackey* did not hold that a worker who was fired for reasons unrelated to his disability "was not entitled to TTD benefits after his termination and before he was completely taken off of work by his treating physician because the employer complied with the provisions of Section 52-1-25.1." Instead, *Lackey* held that an employer who offered post-injury wages to the worker at less than his pre-injury wages was liable for reduced TTD benefits under Section 52-1-25.1(C) between the date of the worker's termination and his doctor's requiring him to stop working. *Lackey*, 1998-NMCA-121, ¶¶ 18-19. Nevertheless, we acknowledge our statement in *Lackey* that if the employer there "wanted to totally avoid liability for disability benefits in the event [the w]orker was fired, it should have rehired him at his pre-injury wage." 1998-NMCA-121, ¶ 20. However, that statement is dicta and far too slender a reed to support a result that is, as we have explained, counterproductive, absurd, and inconsistent with Legislative intent, public policy, and prior case law interpreting the WCA.

**{19}** We hold that an employer's obligation to pay TTD benefits to an injured employee

does not cease because the employee has been terminated—whether or not the termination was for cause. When an injured employee has been discharged by her employer, the determinative inquiry for deciding entitlement to TTD benefits remains whether the worker's condition has stabilized. If the injured employee is able to show that she continues to be temporarily totally disabled as a result of her work-related injury, she is entitled to TTD benefits. Here, the WCJ found that even after her termination, Worker continued to be temporarily totally disabled as a result of the May 26, 2011 accident, and that she had a compensation rate of $183.74. We affirm the award of TTD benefits at Worker's compensation rate from July 14, 2011, to January 11, 2012.

**A Worker's Termination From Employment Does Not Necessarily Preclude Her From Obtaining the Modifier Portion of PPD Benefits Under Section 52-1-26(C) and Sections 52-1-26.1 to -26.4**

**{20}** Once an injured worker reaches MMI, a different statutory provision of the WCA takes effect. Under Section 52-1-26(B), a worker may be eligible for PPD benefits if the worker has suffered a "permanent impairment." The impairment constitutes the base value for the disability benefit award. Section 52-1-26.1(A). In addition to receiving PPD benefits equal to the worker's impairment, an injured worker's benefits are also subject to increase by modification of that impairment rating based on the worker's age, education, job skills, and residual physical capacity. Section 52-1-26(C); *see* §§ 52-1-26.2 to -26.4 (setting forth methods of calculation of modifications). A worker's PPD benefits are not, however, subject to such modification increases if the worker returns to work at or above his pre-injury wage. Section 52-1-26(D).

**{21}** As it argued with respect to the payment of TTD benefits, Employer contends that its termination of Worker for misconduct also renders her ineligible for post-MMI modified benefits. We disagree.

**{22}** Worker's claim for post-MMI PPD benefits arose seven months after her termination and, therefore, her eligibility for these benefits requires consideration of the facts at the time she reached MMI. It is undisputed that Employer did not make Worker any post-MMI offer of employment. After her termination on July 13, 2011, and before reaching MMI, Worker was unemployed for about a month and then got a job at Blake's Lotaburger. She worked there for a few months but ultimately left because of too much pain in her back. Worker then worked for a home healthcare facility for a few months. By the time she reached MMI on January 11, 2012, Worker was not employed. She continued to have the twenty-pound lifting restriction after reaching MMI, which placed her in a light duty capacity. Although she has not applied for any work since January 11, 2012, Worker started taking classes at the University of Phoenix in May 2012 in order to better herself and get an education so that she could eventually get a job.

**{23}** The WCJ concluded that Worker's nonaction in failing to report the allegation of sexual harassment did not rise to the level of employee misconduct so as to warrant a

7

forfeiture of PPD benefits with the statutory modifiers. While we do not agree with the WCJ that the level of employee misconduct plays any role in the calculation of benefits, we nevertheless affirm the award of modifier-based PPD benefits under the right for any reason doctrine. *See State v. Vargas*, 2008-NMSC-019, ¶ 8, 143 N.M. 692, 181 P.3d 684 ("Under the right for any reason doctrine, we may affirm the district court's order on grounds not relied upon by the district court if those grounds do not require us to look beyond the factual allegations that were raised and considered below." (internal quotation marks and citation omitted)).

**{24}** The issue of whether a discharged worker is eligible for the statutory-based modifier adjustment has not been squarely decided in New Mexico. However, we glean some guidance from our decisions in *Jeffrey*, *Connick v. County of Bernalillo*, 1998-NMCA-060, 125 N.M. 119, 957 P.2d 1153, and most recently, *Cordova v. KSL-Union*, 2012-NMCA-083, 285 P.3d 686, *cert. denied*, 2012-NMCERT-007, 295 P.3d 599. All of these cases have reiterated that Section 52-1-26(D) relieves an employer of the liability to pay modifier-based PPD benefits if the worker either (1) accepts employment at or above his pre-injury wage, or (2) unreasonably refuses offered employment at or above his pre-injury wage. *Cordova*, 2012-NMCA-083, ¶ 13; *Connick*, 1998-NMCA-060, ¶ 8; *Jeffrey*, 1994-NMCA-071, ¶¶ 14-15. Thus, PPD benefits are denied if a worker, "through voluntary conduct unconnected with his injury, takes himself out of the labor market." *Jeffrey*, 1994-NMCA-071, ¶ 12 (internal quotation marks and citation omitted). More specifically, PPD benefits may be denied when a partially disabled worker "has made no bona fide effort to obtain suitable work when such work is available." *Id.* (internal quotation marks and citation omitted). With these principles in mind, we turn to consider whether Worker here voluntarily and unreasonably remained unemployed or underemployed.

**{25}** Worker's sole "occupation" for the ten years prior to her injury had been in the fast food restaurant business. All of those previous jobs were similar to the work she did at McDonald's and Blake's Lotaburger. Worker knew of no permanent job at a fast food restaurant that could be done with a twenty-pound lifting restriction. Given that Worker continues to be injured and has lifting restrictions, we cannot say that Worker's decision not to seek employment at a fast food restaurant and to further her education means she is voluntarily unemployed or that she refuses "to take reasonable steps to help [her]self." *See Jeffrey*, 1994-NMCA-071, ¶ 14 (noting that a worker should not be permitted to benefit by voluntarily remaining unemployed or underemployed). In fact, Worker's decision to acquire skills that will make her employable in the future is in accordance with the policy expressed in Section 52-1-26(A), which is to provide workers the "opportunity to return to gainful employment as soon as possible with minimal dependence on compensation awards." Importantly, we note that Employer here does not challenge the reasonableness of Worker's post-termination unemployment and has made no showing that Worker made no effort to obtain suitable work when such work is available. Consequently, we affirm the decision to award PPD benefits based on Worker's physical impairment along with the statutory-based modifier benefits.

**CONCLUSION**

**{26}** For the reasons set forth above, we affirm the compensation order entered by the WCJ.

**{27}** **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**CYNTHIA A. FRY, Judge**

**Topic Index for _Hawkins v. McDonald's_, No. 32,635**

**APPEAL AND ERROR**
Standard of Review

**EMPLOYMENT LAW**
Termination of Employment

**STATUTES**
Interpretation
Legislative Intent

**WORKERS' COMPENSATION**
Disability, Partial
Modification or Termination of Benefits