722 P.2d 652

Jimmy **FIERRO**,
Plaintiff-Appellee/Cross-Appellant,

v.

**STANLEY'S HARDWARE** and **Sentry Claims Service**, Defendants-Appellees,

and

Vincente B. Jasso, State Superintendent of Insurance, and the New Mexico Subsequent Injury Fund, Defendants-Appellants.

Nos. 7908, 7934.

Court of Appeals of New Mexico.

Aug. 15, 1985.

Albert J. Rivera, Alamogordo, for plaintiff-appellee/cross-appellant.

Gregory W. Chase, Alice Tomlinson-Lorenz, Miller, Stratvert, Torgerson & Brandt, P.A., Albuquerque, for defendants-appellees Stanley's Hardware and Sentry Claims Service.

Lisa K. Durrett, Charles W. Durrett, Durrett, Jordon & Grisham, P.C., Alamogordo, for defendants-appellants Jasso and New Mexico Subsequent Injury Fund.

## OPINION

BIVINS, Judge.

In this worker's compensation action plaintiff sued not only his employer, Stan-

ley's Hardware, and its insurance carrier, Sentry Claims Service (referred to as "Stanley's" or "employer"), but also the New Mexico Subsequent Injury Fund and the administrator of the fund, the Superintendent of Insurance (referred to interchangeably as the "Fund" or the "Superintendent"). From a judgment in favor of plaintiff against Stanley's, its carrier and the Fund, the Fund and plaintiff appeal.

Unless otherwise indicated, all references to the Workmen's Compensation Act (Act) shall be to NMSA 1978, Sections 52–1–1 to –69 (Orig.Pamp. and Cum.Supp.1984), and all references to the Subsequent Injury Act (SIA) shall be to NMSA 1978, Sections 52–2–1 to –13.

The Fund raises the following issues:

(1) Since the certificate of preexisting physical impairment was filed after the subsequent injury, whether the employer had sufficient actual knowledge of the preexisting impairment; (2) whether the SIA applies only to preexisting physical impairments arising from accidental injuries, thereby excluding congenital impairments; (3) whether (and if so, how) the limitations of the scheduled member section of the Act apply to the SIA; and (4) whether the trial court correctly apportioned liability between the employer and the Fund.

Plaintiff raises two issues in his appeal:

(1) Whether substantial evidence supports the trial court's finding that plaintiff sustained a 75% permanent partial disability as a result of the accidental injury to his left eye; and (2) whether the trial court erred in refusing to allow a clinical psychologist to give an opinion as to the causal connection between the accidental injury and a claimed psychological disability, and as a subissue, whether a continuance should have been granted so that a psychiatrist could be found to testify.

We hold the facts will not support the finding of actual knowledge by the employer of plaintiff's preexisting physical impairment, and in doing so reexamine this court's prior decision adopting the concept of actual knowledge as a means of complying with the SIA. Because the resolution of this issue is dispositive and requires dismissal of the Fund and its administrator, we do not reach the remaining issues raised by those defendants. Assuming the correctness of the trial court's ruling that availability of the SIA removes the case from the scheduled-member section of the Act, without the benefit of the SIA, plaintiff's issue regarding extent of disability becomes moot and he is relegated to the scheduled-member provisions of the Act. Finally, we hold that a psychologist cannot give a medical opinion as to causation under the applicable provisions of the Act. We remand, however, for entry of a judgment awarding 100% loss of use of plaintiff's left eye under the scheduled injury section of the Act.

To better understand the issues presented, we first state the factual background, describe certain findings and the judgment entered.

At the time he was hired in 1981, plaintiff suffered from a condition known as "Descemet's folds" or "corneal folds" to his right eye, a condition caused by birth trauma or congenital defect. This condition is not correctable by lenses and rendered plaintiff legally blind in the right eye before his subsequent injury. Notwithstanding, plaintiff had a driver's license, and was hired as a truck driver. The employer was not aware of this condition at the time of hiring.

While helping his foreman jump-start a motor vehicle at work on April 3, 1982, the battery exploded causing severe injury to plaintiff's left eye. Without correction, impairment to the left eye is 100%; if sight to this eye is corrected to potential, the impairment may be reduced to 90–95%. However, compensation is not based on corrected vision. *Ranville v. J.T.S. Enterprises, Inc.*, 101 N.M. 803, 689 P.2d 1274 (Ct.App. 1984).

Vision in plaintiff's left eye is limited to counting fingers at a distance of one foot. Since the accident and because of increased use, vision in plaintiff's right eye has im-

proved slightly so that this eye is just above legal blindness. Further improvement is not expected. Using both eyes plaintiff can read a "no-smoking" sign at ten to twelve inches.

Plaintiff attached to his first amended complaint a certificate of preexisting impairment signed by plaintiff and Dr. Ham which recites plaintiff's deficiency in the right eye and states, "[t]hese folds may have been congenital or could possibly have been a result of birth trauma." It recites an 80% disability. The certificate reflects a date of examination of August 29, 1980, and dates of signing by plaintiff on July 29, 1983, and by Dr. Ham on September 16, 1982, both subsequent to the accidental injury.

The trial court found, among other things, that: Before his accidental injury of April 3, 1982, plaintiff had a visual impairment of 80% to his right eye due to congenital defect or birth trauma; plaintiff timely filed a certificate of preexisting impairment with the Department of Insurance indicating plaintiff had a "preexisting 80% permanent impairment as a result of the defect in his right eye"; Stanley's had knowledge of the "disability to the Plaintiff's right eye," and in spite of such knowledge retained him in its employment; plaintiff was able to perform the usual tasks of his employment before the accident of April 3, 1982; as a result of that accidental injury, plaintiff sustained a partial loss of use to the left eye, with visual acuity being reduced from 20/100 to 20/200; plaintiff sustained "a 75 percent partial permanent wage earning disability," due to the injury to the left eye, but had suffered no separate distinct injury to any other part of the body; and plaintiff was not totally disabled from performing work for which he was capable by reason of his background, training and experience.

The trial court artfully fashioned a judgment which grafted onto the scheduled-member section additional compensation through the SIA. It was done this way: First, plaintiff received temporary total disability for a 47-week healing period (April 3, 1982 through March 1, 1983). Second, he received 75% partial disability for 553 weeks. Third, plaintiff was awarded medical expenses, vocational rehabilitation and attorney fees. The judgment required the employer to pay as temporary total disability the first eight weeks of the healing period. Section 52–2–11(C). For the remaining 39 weeks and two days of the healing period, liability was apportioned between the employer and the Fund, with the employer paying 20% and the latter 80%. The judgment required the employer to pay 75% partial disability compensation to plaintiff for the first 120 weeks following the healing period (i.e., 20% of the entire 600 weeks), and the Fund to pay 75% partial disability for the remaining 433 weeks. We express no opinion as to the propriety of this arrangement. *Cf. Mann v. Board of County Commissioners of Bernalillo County,* 58 N.M. 626, 274 P.2d 145 (1954). Medical expense, vocational rehabilitation, costs and attorney fees were apportioned between Stanley's and the Fund on the basis of 20%–80%, respectively.

## I. THE FUND'S APPEAL

The Fund argues that Stanley's did not have actual knowledge of plaintiff's preexisting physical impairment, nor obtain actual knowledge and thereafter retain him in its employment. As part of this argument the Fund contends that although the employer learned through the "grapevine" of some sort of problem plaintiff had with his right eye prior to his second injury, the nature and extent of that awareness fell short of presenting any obstacle to plaintiff's employment as required by the SIA and case law construing it. Plaintiff did not respond to the Fund's contentions by filing an answer brief; Stanley's did.

■ Before discussing the issue, we first dispose of two procedural matters which Stanley's claims precludes review. First, it says the only issue raised at trial was whether the employer had notice of the impairment at the time plaintiff was hired. Stanley's says the Fund did not raise as an issue the extent of knowledge an employer

must have. We have reviewed the record, including the Fund's requested findings of fact and conclusions of law, and believe the issue of actual knowledge was preserved. Second, Stanley's argues that because the Fund admitted timely filing of the certificate of preexisting physical impairment, an alternate to the requirement that an employer have actual knowledge, no proof of knowledge was required. Had the certificate been filed before the second injury, we would agree; however, because the filing occurred after, then, as our discussion which follows demonstrates, actual knowledge must be shown in order to establish substantial compliance. Thus, the issue is actual knowledge, not filing. We now turn to that issue.

Section 52–2–6 contains provisions for the filing of a certificate of preexisting physical impairment, the effect that certificate shall have in limiting the employer's liability in the event of a subsequent injury, and the applicability of the SIA to any disability resulting from an accident taking place after the date the certificate is executed.

In *Vaughn v. United Nuclear Corp.*, 98 N.M. 481, 650 P.2d 3 (Ct.App.1982), this court held that the mandatory requirements for written notice to the employer of a prior physical impairment under Section 52–2–5(C) had been repealed by the later enactment of Section 52–2–6 providing for the filing of a certificate and that the latter statute was permissive. We also said that the provisions of Section 52–2–6(D) which states in part, " 'the Subsequent Injury Act shall be applicable to any disability arising out of [an] accident or occurrence *taking place after the date a certificate is executed* ' " (emphasis in original) would not relieve the fund from liability "where a certificate is executed and filed after a workman incurs a subsequent injury *and* where the employer had actual knowledge of the employee's prior disability." 98 N.M. at 487, 650 P.2d 3 (emphasis added).

In *Vaughn*, as here, the employer filed the certificate after the second injury. The employer in *Vaughn* had actual knowledge of the worker's preexisting impairment or disability because it resulted from an on-the-job accident while the worker was employed by the same employer. The question raised in the present case is whether Stanley's had the requisite actual knowledge of plaintiff's preexisting physical impairment.

The parties agree that the only live testimony in support of the trial court's findings as to actual knowledge came in through Mr. Christie, the manager of Stanley's, who hired plaintiff. Christie testified that when he hired plaintiff he had no knowledge of any problems with his eyes, and prior to the accidental injury plaintiff never told him of any problems. Through the "grapevine" Christie learned indirectly before the accident of April 3, 1982 that plaintiff had "some sort of problem," but never learned the nature or extent of the problem. Christie did not inquire "because it in no way impaired his efficiency as an employee." When asked whether Stanley's, after learning of the problem, took any action to "get rid" of plaintiff "or anything like that," Christie responded, "Oh, no, no, no, no, he was a very adequate employee."

Stanley's directs us to answers to interrogatories where Christie stated, in response to a question as to when he first obtained knowledge that "Jimmy Fierro had an impairment to his right eye," that "I first became aware that Mr. Fierro had a serious visual problem after he was hired and before the accident of April 3, 1982." The parties disagree as to whether or not these answers were introduced into evidence. *See* NMSA 1978, Civ.P.R. 33(b) (Repl.Pamp.1980). Even if they were, Stanley's could not use them to prove actual knowledge. *Crabtree v. Measday*, 85 N.M. 20, 508 P.2d 1317 (Ct.App.1973). Moreover, we do not view the answers to interrogatories as conflicting in any material way with the trial testimony. Christie stated in one answer that "[b]ecause Mr. Fierro's problem did not affect his ability to perform his job, no action was taken after [he] learned about the problem."

*Vaughn* does not state to what extent the employer must have actual knowledge. In that case it was undisputed that the employer knew of the worker's preexisting disability. In fact, it had accommodated the worker following the first accidental injury by changing his duties.

We agree with the Fund that an employer is not going to discriminate on the basis of something he does not know. It is not enough that the employer knew the worker had "some sort of problem." The SIA defines "permanent physical impairment" as "a permanent physical condition which is, or which is likely to be, an obstacle to employment[.]" Section 52–2–3. The policy behind the legislation is to remove obstacles of employment of physically handicapped persons. Section 52–2–2(B). After learning of some problem, Stanley's did not fire plaintiff, change his duties, or manifest any concern that the impairment might subject him to more serious disability should he lose the other eye, as happened in this case. It did not even inquire as to the nature and extent of the problem. Also, Stanley's did not require the employee to file a certificate of preexisting physical impairment. Section 52–2–6. We reject as unpersuasive Stanley's argument that the permanency of the condition could be inferred since "problems with one's sight do not spontaneously resolve themselves." Certainly a person can have a temporary eye problem which does not constitute an obstacle to employment. In short, there was no conscious or informed decision made with regard to plaintiff's continued employment after his employer became aware that he suffered from an eye deficiency.

Therefore, we hold the evidence will not support findings of actual knowledge or retention in employment in spite of that knowledge. In doing so we are mindful of the narrow scope of review which requires that we view the evidence in the light most favorable to support the trial court's findings and indulge all reasonable inferences in favor of the finding, *Sanchez v. Homestake Mining Co.*, 102 N.M. 473, 697 P.2d 156 (Ct.App.1985). Nevertheless, the evidence here simply will not support the findings made.

■ Our discussion would end here except for troublesome problems raised by this issue. In its brief Stanley's argues, "[n]o requirement that the employer [show knowledge of the permanency of plaintiff's preexisting condition] can be implied from New Mexico's statute which does not even contain an express requirement * * * of knowledge, let alone any specific criteria which must be demonstrated." This is correct. The requirement of actual knowledge was judicially created, and does not appear in the SIA. *Vaughn* held the employer in that case substantially complied with the filing requirements of Section 52–2–6 even though the filing took place after the second injury, since the employer had actual knowledge. We said in *Vaughn* that Section 52–2–6 was permissive, not mandatory. We interpret that holding to mean the section is permissive in the sense that the certificate may be filed at any time, even subsequent to the second injury.

New Mexico, like New York, established the actual knowledge requirement, not because of an express provision in the SIA, but because of a belief that such requirement was implicit in the statutory formula. *Zyla v. A.D. Juilliard & Co.*, 277 App.Div. 604, 102 N.Y.S.2d 255 (1951); 2 A. Larson, *The Law of Workmen's Compensation* § 59.33(b) at 10.469 (1983). Professor Larson has made the following criticism of the New York actual knowledge requirement:

The New York rule is defensible only if it is assumed that the exclusive purpose of the second injury principle is to encourage the hiring of the handicapped. This is, of course, the central purpose—but the principle also embraces the idea of achieving this result in a way that works hardship on neither the employer nor the employee. If one did not care about incidental hardship to the employee, one could do the hire-the-handicapped job by merely using an apportionment statute. And if one cares about the element of hardship to the employer, one

could argue the employer ought to be relieved of the cost of the preexisting condition, whether he knew of it or not, purely on the ground that the cost of this impairment, not having arisen out of this employment, should not in fairness fall upon this employer.

2 A. Larson, *supra,* § 59.33(e) at 10.484.

Professor Larson's arguments are supported by the history and purposes of the SIA. In 1959, the legislature revised the state's workmen's compensation laws to include a provision limiting the liability of employers who hired a disabled employee to the disability produced only by the subsequent injury. 1959 N.M. Laws, ch. 67, § 30 (formerly § 59–10–37, NMSA 1953, (2d Repl.Vol. 9, pt. 1)). In 1961, the legislature created the SIA to provide for apportionment of the entire resulting disability between the employer and the Fund. *See Vaughn,* 98 N.M. at 485–486, 650 P.2d 3. Section 52–2–2(C) states that one of the purposes of the SIA is to "make a logical and *equitable* adjustment of employer's liability under the Workmen's Compensation Act \* \* \*." (Emphasis added.) Thus, the purpose of the SIA is not just to promote the hiring of the handicapped, but also to equitably compensate workers for their total disability and to equitably adjust the liability of employers. By contributing to the Fund, Section 52–2–4, employers are able to spread the risk while workers are compensated for the total of their combined disability.

The final argument against the actual knowledge requirement is also provided by Professor Larson: "A more down-to-earth reason for disapproving the New York rule is that \* \* \* it involves one of those distinctions that consume far more litigation time and cost than the policy at stake is worth." 2 A. Larson, *supra,* § 59.33(e) at 10.484. When New York created the actual knowledge requirement, it "found itself

embarked on a tedious decisional journey, with very little company from other states, as it picked its way from case to case sorting out what was or was not adequate employer knowledge." *Id.* § 59.33(b) at 10.470. A review of New York decisions reveals that different factual situations pose extremely difficult questions of actual knowledge. *Id.* Sections 59.33(b) to –.33(e) at 10.465 to –480. If New Mexico retains the actual knowledge rule, then uncertainty as to application of the SIA may result. This would undercut the primary purpose of the SIA, as employers might forego the hiring and retention of handicapped workers rather than face the likelihood of extensive litigation should a subsequent injury occur.[1] The case before us portends just such a tedious decisional journey, and one which we decline to take.

Since the actual knowledge requirement was judicially created, it can be judicially abrogated. *Claymore v. City of Albuquerque, aff'd sub nom, Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234 (1981). For the reasons stated, we reject the actual knowledge requirement. This holding benefits Stanley's only if the filing requirements are truly permissive. Thus, we reexamine Section 52–2–6 in light of this discussion to determine if the requirements of that section are indeed permissive so as to allow filing of the certificate after the subsequent injury.

We believe the holding in *Vaughn* is incorrect to the extent it held the filing requirements of Section 52–2–6(A) permissive. In *Vaughn* we said:

> By repealing the mandatory filing requirements of Section 8, and replacing them with the permissive filing provisions of § 52–2–6(A), *supra,* the legislature clearly expressed an intention to abrogate the mandatory filing provisions of § 52–2–5(C), as they conflict with the later enactment.

---

1. The most famous example of the need for second injury funds is the Oklahoma Supreme Court's decision in *Nease v. Hughes Stone Co.,* 114 Okl. 170, 244 P. 778 (1926). The court in *Nease* held that, if an employee lost a second eye at work, the employer was liable for total compensation. Within 30 days of this decision, between seven and eight thousand one-eyed, one-legged, one-armed and one-handed men lost their jobs in Oklahoma. *See Lawson v. Suwannee Fruit & Steamship Co.,* 336 U.S. 198, 203–204, 69 S.Ct. 503, 505–06, 93 L.Ed. 611 (1949).

98 N.M. at 486, 650 P.2d 3. While we agree that the mandatory filing requirements of Section 52–2–5(C) were replaced by Section 52–2–6, we do not agree that the latter statute is permissive.

Section 52–2–6 provides:

A. Any worker may at any time file, and any employer may require a workman, as a condition of employment or continued employment, to file with the superintendent of insurance, a certificate of preexisting physical impairment.

B. Said certificate shall set forth the nature of the impairment, expressed both as a description of the impairment, and as a percentage of disability as defined in the Workmen's Compensation Act [52–1–1 to 52–1–69 NMSA 1978]; it shall be signed and acknowledged by the workman and a physician duly licensed to practice medicine in the state of New Mexico. The certificate shall state whether the preexisting impairment was caused by accidental injury.

C. In the event any workman suffers compensable injury as defined by the Workmen's Compensation Act, said certificate shall have the effect of limiting the employer's liability under the Workmen's Compensation Act to that disability attributable to the current injury.

D. In the event the certificate of preexisting physical impairment certifies that the impairment was the result of an accidental injury, the Subsequent Injury Act shall be applicable to any disability arising out of accident or occurrence taking place after the date a certificate is executed.

While subsection A states that, "[a]ny worker may at any time file * * * a certificate of preexisting impairment," subsections C and D leave little doubt that the "any time" must mean "any time" before the second injury. Subsection D makes the SIA applicable to any disability resulting from an accident taking place *after* the certificate is executed. If the language of a statute renders its application absurd or unreasonable, it will be construed according to its obvious spirit or reason. *State v.*

*Garcia,* 83 N.M. 490, 493 P.2d 975 (Ct.App. 1971).

The legislature could have used clearer language in subsection A; however, as the supreme court stated in *State v. Nance,* 77 N.M. 39, 45–46, 419 P.2d 242 (1966):

We are committed to an acceptance of the intent of the language employed by the legislature rather than the precise definition of the words themselves. * * *. And, in construing a statute, the legislative intent must be given effect by adopting a construction which will not render the statute's application absurd or unreasonable. * * *. Not only must the legislative intent be given effect, but the court will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the legislature. [Citations omitted.]

*See also State v. Santillanes,* 99 N.M. 89, 654 P.2d 542 (1982); *Reese v. Dempsey,* 48 N.M. 417, 152 P.2d 157 (1944).

Given the primary purpose of the SIA to remove obstacles to the employment of the physically handicapped, the legislature could reasonably require documentation of the preexisting physical impairment so as to insure that the Fund be utilized only where such handicap became a factor in the initial hiring or retention of an employee. As stated in *Vaughn:*

The statute is declaratory of an intention to encourage the employment and retention of handicapped workers by employers. The purpose of filing a certificate is to encourage employers to hire handicapped employees, or to retain workmen who have suffered disabling job-related injuries. The certificate has the effect of limiting the liability of an employer that hires or retains a handicapped employee and who subsequently suffers another disabling injury. The objective of the certificate requirement is not to require registration of a handicapped employee, but to provide notice to an employer of any pre-existing disability of an employee and to document the nature and extent of such disability. *See Baum v.*

*Greyhound Corp.*, 3 Kan.App.2d 456, 601 P.2d 6 (1979), (Spencer, J. dissenting).

98 N.M. at 487, 650 P.2d 3.

Thus, to say that the filing requirements are permissive would not only render meaningless Section 52–2–6, but also undermine an important purpose of the SIA. Surely the legislature would not have included the filing requirements if it did not intend that they be complied with. We are compelled to construe the statute in accordance with the apparent intent and to give it effect. In doing so, we hold that the filing of the certificate must occur before the second injury.

We recognize that employers and their insurance carriers may lose out on apportionment by failing to obtain a certificate of preexisting physical impairment which would indeed be unfortunate since they are required to pay into the Fund. Section 52–2–4. The Supreme Court of California in *Ferguson v. Industrial Accident Commission*, 50 Cal.2d 469, 326 P.2d 145, 150 (1958) gave the following admonition:

> [I]t appears that both employe and employer, in relationships subject to the Workmen's Compensation Act, will be well advised to be diligent in ascertaining, at the very inception of the employment relation, all available or discoverable facts relevant to the prospective employe's physical condition. This should subserve the interests of both employe and employer. In many cases it may result in alerting the employe to possibly incipient processes of disease at a time when they can be interrupted or corrected; it may disclose conditions which will indicate that, for the personal safety or financial welfare of all concerned, certain types of activity should be avoided by some employes or that they possess peculiar aptitude for other endeavors. Certainly periodic medical examinations of all those engaged in industry would not be inimical to the interests of employer, employe, insurance carrier, or the State of California acting as the Subsequent Injuries Fund.

While that advice hardly recognizes the real world where working men and women are often hired on the spot, unless and until the legislature changes the SIA, we are bound to follow it and to construe its provisions in accordance with the legislative intent.

In cases outside the scheduled-member section, the employer and its carrier will suffer from failure to comply with the filing requirements. As will be seen in the following discussion, the worker may also lose out by non-compliance. Because Stanley's did not have actual knowledge as required by *Vaughn* and no certificate of preexisting physical impairment had been filed before the subsequent injury, the SIA does not apply and the Fund is not liable.

Because we change existing law as announced in *Vaughn*, we must decide how the holding of this case is to be applied. Following the approach of *Claymore* (*Scott v. Rizzo* ) the rule that filing of the certificate must occur before the second injury shall apply to the instant case and all cases filed hereafter. Since the certificate here was filed after the second injury, the result does not benefit plaintiff or Stanley's. Further, in those appropriate cases in which the trial commences after the date on which this opinion becomes final, including those which may be remanded for retrial for whatever reasons, this holding shall be applicable. And, finally, the new rule shall be applicable to any case presently pending in the appellate courts in which the issue is preserved.

## II.  PLAINTIFF'S APPEAL

1. Whether plaintiff was totally disabled.

■ As previously noted, the trial court found plaintiff sustained a 75% partial permanent wage earning disability. It found that plaintiff had not suffered any separate or distinct injury to any part of his body other than the injury to the left eye. Finally, the trial court found that plaintiff is not totally disabled from performing work for

which he is capable by reason of his background, training and experience.

Leaving aside the tendered testimony of Dr. Salazar which plaintiff claims would support an award of total disability for "post-traumatic stress syndrome," which we discuss under plaintiff's second point, plaintiff argues under this point that the evidence will not support findings of less than 100% disability based on the injuries or deficiencies to his eyes.

The resolution of this issue does not require a review of the evidence. Section 52–1–43(D) provides:

> The loss of both hands, or both arms, or both feet, or both legs, or both eyes or any two of them, in the absence of conclusive proof to the contrary, *constitutes total disability, permanent in character; provided, the employer shall not be liable for compensation for total disability if the loss of one arm, foot, leg, or eye occurred before the accidental injury for which claim is made, but in that event compensation shall be paid only in accordance with the schedule set forth in Subsection A of this section.* [Emphasis added.]

In *Crane v. San Juan County, New Mexico,* 100 N.M. 600, 673 P.2d 1333 (Ct. App.1983), this court set aside an award of total disability, holding that the worker was relegated to the scheduled member section for loss of use of one eye where loss of the other eye occurred before the accidental injury. Thus, plaintiff here could not recover total disability because of the limitations of Section 52–1–43(D).

We note that although the trial court found plaintiff suffered a 75% permanent partial disability, this award incorrectly took into account the preexisting damage to plaintiff's right eye. *Crane.* The award must be for the left eye only, either total loss of use or partial. Section 52–1–43(A)(41) and (B). The trial court's finding number 33 is that there was a total loss of use of the left eye; however, other findings, *e.g.,* No. 17, reflect a partial loss of use. Findings indicating a partial loss of use of the left eye, when the left eye is considered alone and not in relation to the right eye, lack evidentiary support. The evidence is that the left eye impairment, uncorrected, is 100%.

2. Whether the psychologist's testimony was properly excluded.

In addition to claiming disability from the physical effects of the injury, plaintiff claimed disability based on psychological effects of the injury. If plaintiff could establish total disability due to a psychological injury, he would not be confined to the scheduled-member section of the Act. *Hise Construction v. Candelaria,* 98 N.M. 759, 652 P.2d 1210 (1982). We assume, therefore, in discussing this issue, that the proof offered would support a finding of total permanent disability due to a psychological injury.

In support of this claim plaintiff offered the testimony of Dr. Salazar, a clinical psychologist. The trial court sustained defendants' objection to a critical part of the testimony on the basis that a psychologist cannot give an expert medical opinion as to causal connection between the accident and a psychological disability.

Section 52–1–28(B) provides:

> In all cases where the defendants deny that an alleged disability is a natural and direct result of the accident, the workman must establish that causal connection as a *medical probability by expert medical testimony.* No award of compensation shall be based on speculation or on expert testimony that as a medical possibility the causal connection exists. [Emphasis added.]

Thus, the issue is not Dr. Salazar's qualifications as a psychologist, but rather his qualifications to give "expert medical testimony." No claim is made that Dr. Salazar is a doctor of medicine.

Plaintiff cites only to *Anderson v. Mackey,* 93 N.M. 40, 596 P.2d 253 (1979) and urges us to overrule that case. Quite aside from the fact that this court has no authority to overrule the supreme court, *Mackey* involved the converse situation. In that

case plaintiff introduced the deposition of a medical doctor who testified that, in his opinion, plaintiff suffered from a psychological disability. The doctor, however, qualified his opinion by stating that he had no training in psychological diagnosis. The supreme court sustained the trial court's finding of no causation, reasoning that since the medical expert had no training in psychological diagnosis, he was not qualified to give an opinion based on medical probability.

It is clear that a psychologist can testify as an expert witness to matters within his or her expertise. *See, e.g., State v. Padilla,* 66 N.M. 289, 347 P.2d 312 (1959); *Jenkins v. United States,* 307 F.2d 637 (D.C. Cir.1962). In other jurisdictions where expert testimony on causation is required in workmen's compensation cases (but where there is apparently no statute requiring expert medical testimony), psychologists have been allowed to testify as to causation when it is within their area of expertise. *See Hooper v. Industrial Commission of Arizona,* 126 Ariz. 586, 617 P.2d 538 (Ct. App.1980); *Sandow v. Weyerhaeuser Co.,* 252 Or. 377, 449 P.2d 426 (1969); *Busby v. Martin,* 166 So.2d 660 (La.App.1964).

In New Mexico the practice of psychology is regulated under the Professional Psychologist Act, NMSA 1978, Sections 61–9–1 through –18 (Repl.Pamp.1981 and Cum. Supp.1984). Section 61–9–17 prohibits a psychologist from the practice of medicine as defined by the laws of this state.

NMSA 1978, Section 61–6–18 (Repl. Pamp.1981), which is part of the code regulating medicine and surgery, specifies penalties for anyone who practices medicine without complying with the provisions of Sections 61–6–1 through –28 (Repl.Pamp. 1981 & Cum.Supp.1984). The "practice of medicine" is defined in Section 6–6–15 (Repl.Pamp.1981). This section specifies that the practice of medicine is, among other things, the administration of any drug or medicine (subsection C), or the diagnosis, correction and treatment of any disease, illness, pain, wound, fracture, infirmity, deformity, defect or abnormal physi-

cal or mental condition (subsection E). However, Section 61–6–16 (Repl.Pamp. 1981) provides as follows: "Sections 61–6–1 through 61–2–28 NMSA 1978 shall not apply to or affect: * * * F. the practice, as defined and limited under their respective licensing laws, of: * * * (6) psychology[.]" Thus, under New Mexico law, psychologists may diagnose and treat behavioral disorders to the extent allowed by the licensing laws governing psychologists (the Professional Psychologists Act).

The case of *Katz v. New Mexico Department of Human Services,* 95 N.M. 530, 624 P.2d 39 (1981) involved an analogous situation and is instructive. In that case, Katz argued that "physician's services" includes the services of a chiropractor for the purpose of medicaid benefits under a joint federal-state program. The supreme court said:

> Katz argues that, under state law, the practice of medicine includes chiropractors' services. The practice of medicine is defined by Section 61–6–15, N.M.S.A. 1978, and might arguably include chiropractic practices. However, Section 61–6–16, N.M.S.A.1978, expressly excludes chiropractic practices from the application of Sections 61–6–1 through 61–6–18, N.M.S.A.1978.

*Id.* at 532, 624 P.2d 39.

Likewise, Section 61–6–16 expressly excludes the practice of psychology from the application of the practice of medicine. Therefore, a psychologist cannot render "expert medical testimony" under Section 52–1–28(B). While we might question the rationale for the limiting language of Section 52–1–28(B), that is a matter for the legislature to address, not the courts.

In his conclusion plaintiff requests, in the alternative, a new trial based on the trial court's refusal to grant a continuance so as to permit an expert psychiatrist to provide expert medical testimony. He presents no argument or authority to support this subissue. It is, therefore, deemed abandoned; *In re Doe,* 100 N.M. 764, 676 P.2d 1329 (1984); *State v. Padilla,* 88 N.M. 160, 538 P.2d 802 (Ct.App.1975). In any event,

denial of a motion for a continuance is discretionary and in the absence of abuse, an appellate court will not reverse. *New Mexico Feeding Co. v. Keck*, 95 N.M. 615, 624 P.2d 1012 (1981). No abuse has been demonstrated.

## CONCLUSION

The judgment is set aside and the case remanded with instructions to dismiss the Superintendent and the Fund, and to enter an amended judgment awarding 100% loss of use of the left eye under the scheduled injury section.

No attorney fees or costs are awarded in this appeal.

IT IS SO ORDERED.

ALARID, J., concurs.

WOOD, J., specially concurs.

WOOD, Judge (specially concurring).

This special concurrence is for the purpose of identifying my views on two aspects of Judge Bivins' opinion—knowledge and filing. I concur in all of Judge Bivins' opinion except the specific basis for the result reached as to the two aspects.

(a) Knowledge. There is no "knowledge" requirement in the SIA. We lack authority to change the statutory provisions. *Ranville v. J.T.S. Enterprises, Inc.*, 101 N.M. 803, 689 P.2d 1274 (Ct.App.1984). We lack authority to adopt a "knowledge" requirement which avoids the statutory requirements of the SIA. *Cf. Varos v. Union Oil Co. of California*, 101 N.M. 713, 688 P.2d 31 (Ct.App.1984).

(b) Filing. The Fund may not be held liable for a disability which occurs before a certificate of preexisting physical impairment has been *executed*. NMSA 1978, § 52–2–6(D) is clear on this.

The Fund admitted in its answer that the certificate was timely *filed*. The trial court so found. An admission in pleadings will support a finding. *Lujan v. Gonzales*, 84 N.M. 229, 501 P.2d 673 (Ct.App.1972).

The finding as to a timely *filing* is not pertinent in this case. The filing may be made at any time. Section 52–2–6(A). Re-

gardless of the time of filing a certificate, the pertinent question is the time the certificate was executed. Section 52–2–6(D) provides that the Act applies "to any disability arising out of [an] accident or occurrence taking place after the date a certificate is executed." *Filing* and *execution* are separate matters. They should not be confused.