876 P.2d 656

**Shelby COSLETT n/k/a Shelby Dingus, Claimant–Appellee,**

v.

**THIRD STREET GROCERY and Mountain States Mutual Casualty Company, Respondents–Appellants.**

No. 14912.

Court of Appeals of New Mexico.

March 21, 1994.

Opinion on Denial of Rehearings May 11, 1994.

Certiorari Denied June 17, 1994.

Gerald A. Hanrahan, Albuquerque, for claimant-appellee.

Robert Bruce Collins, Donald C. Clifford, Albuquerque, for respondents-appellants.

## OPINION

HARTZ, Judge.

Third Street Grocery and Mountain States Mutual Casualty Company (who will be referred to jointly as "Employer") appeal a decision by the Workers' Compensation Judge awarding benefits to Claimant. The accidental injury giving rise to the claim occurred on October 1, 1987. Therefore, as the parties have stipulated, this case is controlled by the Workers' Compensation Act in effect on that date (the 1987 Act), which is set forth in the 1987 Replacement Pamphlet for Chapter 52 of the New Mexico Statutes Annotated.

Employer contends that (1) the 1987 Act prohibited Claimant from proving causation by testimony of a Texas physician not licensed to practice in New Mexico and (2) the statute of limitations barred the Judge from considering Claimant's second job at the time of the accident in computing her disability benefits. We reject Employer's first contention but agree with the second. We therefore reverse and remand for entry of an amended award.

## I. TESTIMONY BY TEXAS PHYSICIAN

 Employer makes a very straightforward argument regarding the inadmissibility of the causation testimony by the Texas physician. NMSA 1978, Section 52–1–28(B) (Repl.Pamp.1987), states:

In all cases where the employer or his insurance carrier deny that an alleged disability is a natural and direct result of the accident, the worker must establish that causal connection as a probability *by expert testimony of a health care provider, as defined in Section 52–4–1 NMSA 1978,* testifying within the area of his expertise. (Emphasis added.)

The pertinent language of NMSA 1978, Section 52–4–1 (Repl.Pamp.1987), relied upon by Employer is:

A. As used in this section, "health care provider" means:

(1) any hospital which is maintained by the state or any political subdivision of the state, or any place which is currently licensed as a hospital by the health and environment department ...

(2) an optometrist licensed pursuant to the provisions of Chapter 61, Article 2 NMSA 1978;

(3) a chiropractor licensed pursuant to the provisions of Chapter 61, Article 4 NMSA 1978;

(4) a dentist licensed pursuant to the provisions of Chapter 61, Article 5 NMSA 1978;

(5) a physician licensed pursuant to the provisions of Chapter 61, Article 6 NMSA 1978;

(6) a podiatrist licensed pursuant to the provisions of Chapter 61, Article 8 NMSA 1978;

(7) an osteopathic physician licensed pursuant to the provisions of Chapter 61, Article 10 NMSA 1978;

(8) a psychologist who is duly licensed or certified in the state where the service is rendered, holding a doctorate degree in psychology and having at least two years clinical experience in a recognized health setting, or who has met the standards of the national register of health services providers in psychology; or

(9) a certified nurse-midwife licensed by the board of nursing as a registered nurse and registered with the health services division of the health and environment department as a certified nurse-midwife.

Thus, the only physicians who are health care providers defined in Section 52–4–1 are physicians "licensed pursuant to" New Mexico law. Employer argues that because Section 52–1–28 states that causation can be established only through testimony by health care providers defined in Section 52–4–1, the testimony of the Texas physician was not competent to establish causation. This argument has more than superficial appeal.

Nevertheless, we reject Employer's argument. Based on our understanding of the purpose of Section 52–4–1, the history and purpose of Section 52–1–28, and the contexts in which the phrase "health care provider, as defined in Section 52–4–1" is used throughout the 1987 Act, we conclude that the phrase was used by the legislature as a shorthand expression to refer to the licensed occupations listed in Section 52–4–1, without reference to the requirement of licensure in New Mexico.

Before beginning our analysis we should note that imprecision in the language of New Mexico's workers' compensation laws is hardly unprecedented. Particularly in the past decade, amendments and revisions to these laws have been products of extensive public debate and hard-fought compromise. The compromise is likely to be so tenuous that no interested party desires to jeopardize it by seeking to fine tune statutory language. Consequently, various provisions of the statutes may reflect general principles rather than detailed recipes. What we once said about the 1986 amendments can apply here as well:

[T]he legislature ... was not concerned with the detailed interrelationships among the provisions of the Act and how the Act would be applied to various recurring, although unusual, circumstances. The apparent legislative intent was to establish certain benchmarks and to leave to the courts the task of "rationalizing" the provisions of the statute.

*Barela v. Midcon of New Mexico,* 109 N.M. 360, 364, 785 P.2d 271, 275 (Ct.App.), *cert. denied,* 109 N.M. 262, 784 P.2d 1005 (1989).

■ Of course, we should not use inexactitude in the drafting of statutes as an excuse to impose our personal values on a legislative compromise. But the fear of judicial usurpation of the legislative role should not compel the courts always to adopt a literal interpretation—that interpretation of a phrase in a statute which would, aside from context, be the most straightforward. The judge's first duty is to determine the meaning of the language used by the legislature. When the context strongly suggests that an alternative interpretation better advances the purpose of the legislation and there is no apparent reason why the legislature would have preferred the literal interpretation, judicial adoption of the literal interpretation is an abdication of responsibility.

■ We now turn to the pertinent statutory provisions. Section 52–4–1 was enacted in 1983, *see* 1983 N.M.Laws, ch. 116, § 1, and remained unchanged in the 1987 Act. Prior to 1987 no other section cross-referenced it. Its purpose is set forth in its title: "Definitions; restrictions on choice of health care providers prohibited under policies of workmen's compensation and occupational disease disablement." Provisions like Section 52–4–1 are often called "freedom of choice" laws. *See, e.g.,* NMSA 1978, § 59A–22–32 (Repl. Pamp.1992) (providing freedom of choice in health insurance contracts). The operative language, which appears in Section 52–4–1(C), states:

> Whenever any health services contract [as defined in Section 52–4–1(B) ] ... provides for payment, reimbursement or indemnification for any service which is within the lawful scope of practice of a health care provider in this state, such payment, reimbursement or indemnification shall not be denied when such service is rendered by the health care provider[.]

In other words, roughly speaking, when treatment for a compensable injury is within the proper scope of the expertise of a health care provider, the workers' compensation insurer must pay for the treatment; the insur-

er cannot refuse to pay for the services of, say, an osteopath or podiatrist.

The aspect of Section 52–4–1 which is critical to the present case is that freedom of choice is restricted to only those health care providers who are licensed in New Mexico (with the exception of psychologists, who need only be "licensed or certified in the state where the service is rendered," Section 52–4–1(A)(8)). This restriction is perhaps not surprising because the impetus for such freedom-of-choice enactments frequently comes from the New Mexico practitioners who will benefit. In any event, it is worth noting that Section 52–4–1 does not prohibit insurance coverage for treatment by health care professionals not licensed in New Mexico. It is just that such coverage is not mandated by this section.

How did the definition in a freedom-of-choice provision become incorporated into a section of the 1987 Act governing the qualification of expert witnesses? Until 1987, NMSA 1978, Section 52–1–28(B) (Orig.Pamp.) required proof of causation "as a medical probability by expert medical testimony." Testimony by medical doctors and osteopaths satisfied the statute. *See Medina v. Original Hamburger Stand,* 105 N.M. 78, 728 P.2d 488 (Ct.App.1986) (osteopaths). In *Fierro v. Stanley's Hardware,* 104 N.M. 401, 410, 722 P.2d 652, 661 (Ct.App.1985), *rev'd on other grounds,* 104 N.M. 50, 716 P.2d 241 (1986), however, this Court held that testimony by a psychologist was not "expert medical testimony." We followed *Fierro* in an unpublished opinion holding that testimony by a chiropractor also failed to satisfy Section 52–1–28. *See Vallejos v. KNC, Inc.—A Rogers Co.,* 105 N.M. 613, 735 P.2d 530 (1987) (reversing our memorandum opinion). The legislature responded promptly. It "overruled" *Fierro* at its next legislative session, amending Section 52–1–28 by substituting "expert testimony of a health care provider, as defined in Section 52–4–1" for "expert medical testimony." Consequently, psychologists, chiropractors, and other health care practitioners could testify to causation. The timing and content of the 1987 amendment strongly imply a legislative determination that the prior language was restricting workers too much in how they could prove causa-

tion. Employer suggests that the 1987 amendment was actually intended to restrict case law allowing causation testimony because prior to the effective date of the 1987 amendment the Supreme Court had overruled *Fierro* and its progeny in *Madrid v. University of California*, 105 N.M. 715, 737 P.2d 74 (1987). This argument, however, ignores the fact that the *Madrid* decision was filed on March 18, 1987,[1] the day after the legislature passed the amendment. One must conclude that the purpose of the amendment was to expand the admissibility of expert testimony regarding causation, not to restrict it.

To be sure, the legislature might have intended to expand the categories of experts who could testify as to causation but still restrict the experts to those licensed in New Mexico. Yet, we fail to see why it would have wished to do so. The restriction would make little sense as an attempt to ensure the reliability of expert testimony. We doubt that there is any reason to believe that physicians licensed in other states are less expert on matters of causation than New Mexico physicians. The definition chosen for "health care provider" in Section 52–4–1 does not imply that health care professionals licensed in other states are less expert than those licensed in New Mexico. After all, insurers are still permitted to pay for care by providers not licensed in New Mexico; Section 52–4–1 just does not require them to.

Nor is it likely that a restriction to New Mexico licensees would be imposed to save expenses in workers' compensation cases. If a worker is being treated by a physician in another state, it would probably be more expensive to have a New Mexico physician examine the worker and provide testimony than it would be to have the out-of-state physician testify by means of a deposition. One might argue that the legislature wished to eliminate the possibility of out-of-state hired guns testifying in workers' compensation matters, but the money at stake ordinarily would not justify such an expenditure and the records in the many workers' com-

pensation cases that come before this Court establish that there is no scarcity of in-state medical witnesses willing to testify on behalf of workers or employers.

Not only would little or no purpose be served by the restriction of expert causation testimony to New Mexico licensees, but it would also be unfair to workers. Under the 1987 Act the employer has the right to direct the worker's medical care; the worker can choose the provider of medical services only if the employer has failed to furnish adequate care. *See Bowles v. Los Lunas Sch.*, 109 N.M. 100, 104–08, 781 P.2d 1178, 1182–86 (Ct.App.), *cert. denied*, 109 N.M. 131, 782 P.2d 384 (1989). In providing medical services it could be quite reasonable for the employer to select only health care professionals from other states. That could happen if the worker lived in another state or lived in a New Mexico border community served by out-of-state physicians. As a consequence of the employer's choice of out-of-state providers, however, the worker could not obtain causation testimony by those experts most familiar with the worker's condition and most accessible as witnesses. The worker would need to obtain expert causation testimony from a health care professional who had not been involved in the worker's treatment.

We conclude that it is highly unlikely that the legislature intended to restrict expert causation testimony to only those health care professionals who are licensed in New Mexico. The reference in Section 52–1–28 to Section 52–4–1 can best be explained as the use of a handy list of health care professionals who treat workers and therefore would be competent to render an opinion on causation.

This conclusion is reinforced by the use elsewhere in the 1987 Act of the phrase "health care provider, as defined in Section 52–4–1." The phrase appears in three provisions of the Act other than Section 52–1–28: NMSA 1978, Section 52–1–51; NMSA 1978, Section 52–1–43; and NMSA 1978, Section 52–1–50.

The strongest support for our construction of the phrase comes from Section 52–1–51.

---

1. The March 18, 1987, decision was rendered on rehearing. The original decision, filed on November 24, 1986, agreed with *Fierro*. *Madrid v.*

*University of Cal.*, Vol. 26, No. 6, SBB 113 (1986).

Section 52–1–51(A) entitles the employer (or insurer) to require the worker to submit to a physical examination by a physician chosen by the employer. The examination, which can be required before or after the filing of a claim or before or after an award of compensation, is for the purpose of determining the extent of the worker's disability. The physician performing the examination need not be licensed in New Mexico. Paragraph (2) of Subsection A states that the examination "shall be by a physician qualified to practice medicine under the law of this state or of the state or county wherein the claimant resides." The following paragraph states that a worker who lives outside of New Mexico cannot be required to come to New Mexico for the examination sought by the employer. Section 52–1–51(A)(3). Under Section 52–1–51(D) any physician selected to conduct or be present at the examination of the worker "may be required to testify as to the conduct thereof and the findings made."

■ In 1987 Subsection E was added to Section 52–1–51 to provide the worker with a right similar to that of the employer to select someone to evaluate the injury. Subsection E states:

A worker may have a physician or other *health care provider of his choice, as defined in Section 52–4–1* NMSA 1978, other than the physician chosen by the employer under Subsection A of this section examine him and evaluate his injury. In that event, the worker shall pay for the services of that examiner unless the final determination of the worker's claim is that the worker's claim of impairment is correct and differed from the employer's physician's opinion of percentage of impairment by more than twenty percent, in which case the employer shall pay directly to the

worker's examiner or reimburse the worker for the amounts charged by the worker's examiner for the evaluation of impairment. (Emphasis added.)

In this subsection does "health care provider of his choice, as defined in Section 52–4–1" include only practitioners licensed in New Mexico? We think not. Given that the employer may select a physician licensed in the state of the worker's residence and that a non-resident worker cannot be compelled to come to New Mexico for an examination sought by the employer, it would be incongruous if a non-resident worker were limited by Section 52–1–51(E) to select only persons licensed in New Mexico to conduct an examination. We recognize that Subsection E creates an asymmetry between the employer and the worker with respect to whom they may select to conduct an examination and evaluation of the worker. The employer may select only a physician, whereas the worker may select persons in additional fields, such as podiatry or optometry. Perhaps one could therefore conclude that the legislature might also treat the employer and the worker differently with respect to whether the person conducting the examination must be licensed in New Mexico. But the very asymmetry created by Subsection E suggests that the legislature was giving the worker more leeway than the employer. Thus, the asymmetry in the provisions regarding the worker and the employer only emphasizes the incongruity of limiting the worker to examinations by persons licensed in New Mexico. Once again, we are led to the conclusion that when the legislature used the phrase "health care provider . . . as defined in Section 52–4–1," it was not referring solely to persons licensed in New Mexico.[2]

---

2. Because Subsection E speaks of "a physician or other health care provider . . . as defined in Section 52–4–1," it might be argued that the worker can select any physician (just as can the employer) but other health professionals must be licensed in New Mexico. We find that construction to be too strained. Because the language of the statute is "physician or *other* health care provider," we infer that the physicians who may conduct the examination for the worker must be ones who come within the meaning of "health care provider." The words "a physician or" may therefore seem to be surplusage, because they

add no substantive content to the provision; yet the words nevertheless serve the purpose of clarifying and emphasizing that the worker is not restricted to the use of physicians to conduct an examination. Moreover, even if we interpreted Subsection E as permitting an examination by a physician who was not otherwise a "health care provider, as defined in Section 52–4–1," there would remain the question of why the legislature would restrict the worker to only those other health care providers who are licensed in New Mexico when the legislature has shown solicitude in Section 52–1–51(A)(3) for non-resident work-

We draw the same inference from the use of the phrase in Subsection D of Section 52-1-43, which deals with scheduled injuries. Subsection D contains the following language:

> In determining the worker's compensation benefits payable to a worker under this section for a disability resulting from a scheduled injury, the worker is entitled to be compensated as provided in Subsection A of this section up to the date the worker is released from regular treatment by his primary treating *health care provider, as defined in Section 52-4-1* NMSA 1978 if he is in fact totally disabled during that time. (Emphasis added.)

How is this provision to be applied to a worker who resides in another state? One would expect such a worker to be receiving health care in the state of residence. The person providing health care is unlikely to be licensed in New Mexico. Consequently, Section 52-1-43(D) ordinarily could not apply to a non-resident worker if "health care provider, as defined in Section 52-4-1" is construed to include only health care professionals licensed in New Mexico. If the person providing worker's health care is not licensed in New Mexico, the worker can *never* be released by "his primary treating health care provider, as defined in Section 52-4-1" because the worker has no such "treating health care provider." The unlikelihood that such a result was intended by the legislature again implies that the words "health care provider, as defined in Section 52-4-1" should be construed to mean "those persons licensed (not necessarily in New Mexico) in one of the occupations listed in Section 52-4-1."

A similar analysis applies to Section 52-1-50(E). The first sentence of that subsection states:

> To be entitled to vocational rehabilitation services or benefits, a disabled worker must notify the employer in writing that he has been released within one hundred twenty days from the date that he is released from regular treatment by his primary treating *health care provider as de-*

*fined in Section 52-4-1* NMSA 1978. (Emphasis added.)

This provision would ordinarily not apply to a non-resident entitled to benefits under the 1987 Act unless we construe "health care provider, as defined in Section 52-4-1" in the same manner as suggested for Sections 52-1-28, 52-1-43(D), and 52-1-51.

In our view, the pattern of the legislature's use of the language "health care provider, as defined in Section 52-4-1" in the 1987 amendments to the Workers' Compensation Act compels only one sensible construction of that language. When the legislature used the words "as defined in," it did not mean that the full definition in Section 52-4-1 was to be incorporated into the cross-referencing provisions. Rather, the phrase was used only as a shorthand to refer to a list of particular health care occupations. We conclude that anyone licensed in the occupations listed in Section 52-4-1 is a "health care provider, as defined in Section 52-4-1." In particular, a physician licensed in the State of Texas who treats a worker resident in that state may provide the expert causation testimony required by Section 52-1-28(B). We reject Employer's contention to the contrary.

## II. ADDITIONAL COMPENSATION BASED ON SECOND JOB/STATUTE OF LIMITATIONS

■ Claimant was injured at work on October 1, 1987. Employer promptly commenced paying weekly benefits of $183.33 and continued those payments until April 30, 1992. The benefits were calculated solely on the basis of Claimant's wages from Third Street Grocery. When benefits were suspended in April 1992, Claimant sought legal advice. From that advice she became aware for the first time that she might be entitled to an increased compensation rate on the ground that at the time of her injury in 1987 she was earning wages from a second job in addition to her earnings at the grocery. *See Justiz v. Walgreen's,* 106 N.M. 346, 742 P.2d 1051 (1987). On June 16, 1992, Worker filed her claim with the Workers' Compensation Administration, seeking, among other things, a higher benefit rate. Employer contends

ers by not requiring them to travel to New Mexi- co for an examination sought by the employer.

that insofar as the claim sought an increased benefit rate, it was untimely. We agree.

NMSA 1978, Section 52–1–31(A) (Repl. Pamp.1987), states:

> If an employer or his insurer fails or refuses to pay a worker any installment of compensation to which the worker is entitled under the Workers' Compensation Act, after notice has been given as required by Section 52–1–29 NMSA 1978, it is the duty of the worker insisting on the payment of compensation to file a claim therefor as provided in the Workers' Compensation Act not later than one year after the failure or refusal of the employer or insurer to pay compensation. This one-year period of limitations shall be tolled during the time a worker remains employed by the employer by whom he was employed at the time of such accidental injury, not to exceed a period of one year. If the worker fails to give notice in the manner and within the time required by Section 52–1–29 NMSA 1978 or if the worker fails to file a claim for compensation within the time required by this section, his claim for compensation, all his right to the recovery of compensation and the bringing of any proceeding for the recovery of compensation are forever barred.

Thus, Claimant was required to file her claim within one year after Employer "fail[ed] or refuse[d]" to pay the compensation benefits due her. In this case Employer had been making payments to Claimant through April 1992, but the payments were less than what Claimant contends were due after taking into consideration her second job at the time of her accident. In other words, Employer had been paying compensation, but not the full amount that Claimant now claims was due.

Assuming the truth of Claimant's contentions regarding her second job, the one-year statute-of-limitations period began to run from the time that Employer first underpaid benefits—that is, from the date of the initial payment in 1987. We reach this conclusion on the authority of *Rodriguez v. X–Pert Well Service,* 107 N.M. 428, 759 P.2d 1010 (Ct. App.), *cert. denied,* 107 N.M. 413, 759 P.2d 200 (1988); *see also Gonzales v. Gackle Drill-*

*ing Co.,* 67 N.M. 130, 353 P.2d 353 (1960). In *Rodriguez* the employer had been making disability benefit payments to worker for a period of time before it mailed a reduced amount for one payment and then discontinued payments. We held that the limitations period began to run from the date of the reduced payment, which constituted a failure to pay the full benefit to which the worker was entitled. In the case presently before us on appeal, Employer in 1987 failed to pay the full amount that Claimant now contends was due, so the claim filed in 1992 was long after the expiration of the limitations period.

■ Claimant advances several arguments against this conclusion. First, she contends that there is no provision in the 1987 Act "recognizing a limitations defense to a worker's claim for an increased compensation rate." We disagree. To be sure, the Act contains no limitations period specifically addressed to claims for increased compensation based on the failure to consider wages earned from a second employer. But the benefits being sought by such a claim are disability benefits, and Section 52–1–31(A) is unquestionably a statute of limitations for claims for disability benefits. The decisions that have held that there is no statute of limitations for claims for medical benefits, *Zengerle v. City of Socorro,* 105 N.M. 797, 800, 737 P.2d 1174, 1177 (Ct.App.1986), *cert. quashed,* 105 N.M. 781, 737 P.2d 893 (1987), *overruled on other grounds by Whittenberg v. Graves Oil & Butane Co.,* 113 N.M. 450, 827 P.2d 838 (Ct.App.1991), *cert. denied,* 113 N.M. 352, 826 P.2d 573 (1992), or vocational rehabilitation benefits, *Benavidez v. Bloomfield Mun. Sch.,* 117 N.M. 245, 871 P.2d 9 (Ct.App.1994), are founded on the absence of a provision in the Workers' Compensation Act setting a time limit for claims for those types of benefits. In contrast, there *is* a provision setting a time limit for claims for disability benefits, and there is nothing in the statute to suggest that the applicability of the limitations period depends upon the legal theory forming the basis for the claim for such benefits. We should note that Claimant's argument is not that there was a change in her physical condition, which is a perfectly proper ground for an increase or

decrease in disability benefits. *See* NMSA 1978, Section 52–1–56 (Repl.Pamp.1987); *Holliday v. Talk of the Town Inc.,* 98 N.M. 354, 648 P.2d 812 (Ct.App.), *cert. denied,* 98 N.M. 336, 648 P.2d 794 (1982).

■ Second, Claimant contends that there was no statutory bar because she did not know of her right to increased benefits until she consulted with her attorney in 1992. Claimant cites no authority for her contention that ignorance of her legal rights tolls the statute of limitations. When a worker does not know or have reason to know of the facts necessary to form the basis of a claim, the statute of limitations under the Workers' Compensation Act does not begin to run. *See ABF Freight Sys. v. Montano,* 99 N.M. 259, 657 P.2d 115 (1982). But no New Mexico decision has suggested that ignorance of the governing law tolls the limitation period. We agree with the following statement by the Washington Supreme Court.

> The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action. The action accrues when the plaintiff knows or should know the relevant facts, whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action. Were the rule otherwise, the discovery rule would postpone accrual in every case until the plaintiff consults an attorney.

*Allen v. State,* 118 Wash.2d 753, 826 P.2d 200, 203 (1992) (en banc).

■ Third, Claimant argues that Employer waived its statute-of-limitations defense by not raising it in a timely fashion. The defense was raised in the pre-trial order. Although Claimant contended below that the defense had been waived, the Judge addressed the matter on the merits, thereby implicitly permitting Employer to amend its pleadings to raise the defense. New Mexico decisions grant broad discretion to trial judges to allow amendments to pleadings, including amendments raising additional legal theories. *See Schmitz v. Smentowski,* 109 N.M. 386, 389–92, 785 P.2d 726, 729–32 (1990). We find no abuse of discretion by the Judge in permitting Employer to raise the limitations defense. Claimant does not argue that she was prejudiced, and we fail to

see how she could have been prejudiced by the delay in raising the defense.

We therefore hold that Claimant was barred from seeking increased disability benefits based on her additional employment at the time of her injury. Claimant is, however, still entitled to benefits based on her earnings at Third Street Grocery. Employer does not raise a statute-of-limitations defense with respect to those basic benefits. Thus, we need not decide whether Employer was estopped from arguing that the limitations period had expired on the basic benefits because it had been underpaying benefits. *See* NMSA 1978, § 52–1–36 (Repl.Pamp.1987) (effect of failure of worker to file claim by reason of conduct of employer).

## III. CONCLUSION

We affirm the compensation order except that disability benefits should be recomputed based solely on Claimant's earnings from Third Street Grocery. We award Worker $1500 for attorney fees on appeal.

**IT IS SO ORDERED.**

BIVINS and ALARID, JJ., concur.

### *OPINION DENYING MOTIONS FOR REHEARING*

May 11, 1994

This matter comes before us on Claimant's Motion for Rehearing and a pleading by the New Mexico Workers' Compensation Administration (WCA) entitled "Motion for Leave to File Brief as Amicus Curiae and for Rehearing." We deny both motions for rehearing.

## I. CLAIMANT'S MOTION

Claimant contends that we erred in holding that her award of an increased compensation rate was barred by the statute of limitations. Some of Claimant's arguments in support of her contention were raised in her original answer brief and addressed in our opinion filed on March 21, 1994. We now discuss only matters that Claimant contends were overlooked in that opinion.

Claimant's principal argument is that we have misconstrued NMSA 1978, Section 52–1–31(A) (Repl.Pamp.1991), by adding words to the provision. She asserts that our opinion improperly inserts in the language of Section 52–1–31(A) the words that are emphasized in the following passage:

If an employer or his insurer fails or refuses to pay a worker any *exact* installment of compensation to which the worker is entitled ... it is the duty of the worker insisting on the payment of compensation to file a claim ... not later than one year after the failure or refusal of the employer or insurer to pay *exact* compensation *due.*

We disagree. Both the dictionary and legal tradition support our interpretation.

The heart of Claimant's argument is the implicit assertion that an employer or insurer "fails to pay" an installment of compensation only if it pays nothing whatsoever. But a "failure" to pay can be any insufficiency in the payment of what is due. A typical definition of "fail" includes: "1. to fall short of success or achievement in something expected, attempted, desired, or approved; ... 3. to be or become deficient or lacking; fall short; be insufficient or absent...." *The Random House Dictionary of the English Language* 510 (1971). Thus, an employer or insurer "fails" to pay an installment of compensation if the amount paid "falls short" of the amount due. *Cf. In re Merritt's Will,* 171 Misc. 812, 14 N.Y.S.2d 103, 107 (Sur.Ct. 1939) (failure of gift under a will); *San Jacinto Oil Co. v. Ft. Worth Light & Power Co.,* 41 Tex.Civ.App. 293, 93 S.W. 173, 175–76 (1906) (failure of oil wells). The one-year limitations period for Claimant's claim for increased compensation therefore began to run when Employer first paid less than the amount now claimed.

Moreover, Claimant's construction of Section 52–1–31(A) would create a result at odds with the traditional legal principle that, subject to the discovery rule, the statute of limitations begins to run when the plaintiff's cause of action accrues. *See Saiz v. Belen Sch. Dist.,* 113 N.M. 387, 401 n. 12, 827 P.2d 102, 116 n. 12 (1992); NMSA 1978, § 37–1–1 (Repl.Pamp.1990). We have no doubt that a worker's cause of action accrues whenever

the payments are less than the amount due. NMSA 1978, Section 52–5–18 (Repl. Pamp.1991), states that a worker receiving maximum compensation cannot file a claim, except for additional compensation arising from the employer's failure to provide a safety device. Read together, Sections 52–1–31(A) and 52–5–18 imply that a worker receiving less than what is due can proceed with a claim under the Workers' Compensation Act. *See Rollins v. Albuquerque Pub. Sch.,* 92 N.M. 795, 797, 595 P.2d 765, 767 (Ct.App.) ("When maximum compensation benefits are refused or reduced, a workman can then file a claim for maximum compensation benefits[.]"), *cert. denied,* 92 N.M. 675, 593 P.2d 1078 (1979). Under the traditional principle, one would then expect the limitations period to begin when payments are less than the law requires. We see no reason to read Section 52–1–31(A) to provide otherwise. A worker receiving less than the amount due cannot wait until other claims ripen before filing. *See Noland v. Young Drilling Co.,* 79 N.M. 444, 446–47, 444 P.2d 771, 773–74 (Ct.App.1968) (worker cannot disregard compensable injury and wait until permanent incapacity results therefrom before he is obliged to file his claim).

Claimant also contends that our decision is contrary to an earlier unpublished decision by this Court. We need not consider whether that decision should be distinguished or criticized. Unpublished opinions of this Court have no precedential value and should not be cited as authoritative in briefs to this Court. *See* SCRA 1986, 12–405(C); *Vigil v. Martinez,* 113 N.M. 714, 718, 832 P.2d 405, 409 (Ct.App.1992).

Finally, we have noted Claimant's expressions of concern that our opinion will encourage misconduct by employers. Yet, in the present case the record does not indicate any inequitable behavior by Employer that would estop it from raising a statute-of-limitations defense to Claimant's claim for additional compensation based on her employment by a second employer. As for future cases, we are confident that NMSA 1978, Section 52–1–36 (Repl.Pamp.1991), will be an effective tool to prevent any inequities arising from employer misconduct.

## II. MOTION BY WORKERS' COMPENSATION ADMINISTRATION

To begin with, we note that it is uncertain whether after an opinion has been filed one can seek amicus status and move for rehearing. *Compare Green v. Biddle,* 21 U.S. 1, 17–18, 5 L.Ed. 547 (1823) *and San Diego Flume Co. v. Souther,* 104 F. 706 (9th Cir. 1900) *with City of Denver v. Denver Tramway Corp.,* 23 F.2d 287, 295 (8th Cir.1927), *cert. denied,* 278 U.S. 616, 49 S.Ct. 20, 73 L.Ed. 539 (1928) *and Episcopal Retirement Homes v. Ohio Dep't of Indus. Relations,* 62 Ohio St.3d 1214, 582 N.E.2d 606 (1991). We need not decide the matter in this case because we deny the WCA's motion on the merits.

In a nutshell, the WCA contends that our opinion undermines its cost-containment efforts under Chapter 4 of Article 52 of the New Mexico Statutes and regulations implementing that chapter. The regulations establish a schedule of maximum charges for services provided by health care providers. *See, e.g.,* NMSA 1978, § 52–4–5 (Repl. Pamp.1991) (Effective Apr. 1, 1991).

The WCA's concerns are based upon a misreading of our opinion. As stated in the third sentence of our opinion, the parties stipulated that the case is controlled by the provisions of the Workers' Compensation Act in effect on October 1, 1987. At that time the legislature had enacted no cost-containment provisions in the Workers' Compensation Act. The WCA contends that regardless of the date of the accidental injury, the cost-containment provisions apply to any services rendered by health care providers after the effective date of the cost-containment legislation and regulations. The WCA may be right in that regard, but that was not an issue in this appeal.

The WCA apparently believes that our opinion interprets "[NMSA 1978,] Section 52–4–1 'as a short-hand to refer to a list of particular health care occupations[.]' " This belief is incorrect. The opinion does not interpret NMSA 1978, Section 52–4–1 (Repl. Pamp.1987). What the opinion does do is consider the extent to which the definition in Section 52–4–1 is incorporated into NMSA 1978, Section 52–1–28(B) (Repl.Pamp.1987) by the language "health care provider, as defined in Section 52–4–1." In particular, our opinion does not construe the term "health care provider" in the present versions of NMSA 1978, Sections 52–1–49, 52–4–2, 52–4–3, 52–4–4 (Repl.Pamp.1991), and 52–4–5. *Cf. Lawson v. Suwannee Fruit & S.S. Co.,* 336 U.S. 198, 69 S.Ct. 503, 93 L.Ed. 611 (1949) (definition of "disability" in another section of workers' compensation act did not apply to section at issue).

Not only does our opinion not construe the cost-containment provisions of post–1987 versions of the Workers' Compensation Act, but also our opinion does not consider any effect that those later provisions may have on the application of Section 52–1–28(B). The effect on Section 52–1–28(B) could be direct—as when a later enactment establishes legislative intent requiring a new interpretation of previously enacted language, *see Smith v. United States,* —— U.S. ——, ——, 113 S.Ct. 2050, 2058, 124 L.Ed.2d 138 (1993) (amendment to statute, which did not redefine the word "use," made clear that the amending Congress intended a broad meaning for the word, even if the Congress that originally passed the provision had intended a more limited meaning); or the effect could be indirect—by limiting the persons providing services to the worker so that the only persons who have the information necessary to testify regarding causation are health care providers meeting all of the requirements set forth in Section 52–4–1. (We note that under the current version of Section 52–4–1 the term "health care ·provider" includes out-of-state providers specifically approved by the director of the WCA. *See* NMSA 1978, § 52–4–1(O) (Repl.Pamp.1991) (Effective Jan. 1, 1991).)

In short, we deny the WCA's motion for rehearing because the concerns expressed in its motion are predicated on a misreading of our opinion.

**IT IS SO ORDERED.**

BIVINS, J., concurs.

ALARID, J., concurs in the denial of the motions, but not in this opinion.